BELLERIVE INVESTMENT COMPANY ET AL., Appellants, v. KANSAS CITY ET AL.—13 S. W. (2d) 628.

Division One, February 1, 1929.

*Johnson, Lucas & Graves* and *Gossett, Ellis, Dietrich & Tyler* for appellants.

972

*John T. Barker, R. K. Ryland* and *A. R. Wolfe* for respondents.

SEDDON, C.—This is a suit in equity wherein the plaintiffs seek to enjoin the municipality of Kansas City, and certain named administrative officers of said municipality, from enforcing an ordinance of said city, No. 44950, duly enacted by the common council of said city, and approved by the mayor of said city on March 30, 1923, which ordinance became effective and operative on the date of its approval by the mayor of Kansas City. The ordinance in question, omitting its title and caption, is as follows:

"Section 1. No person, firm, or corporation, shall use, occupy, operate, manage or let any living or sleeping quarters over any room, place or establishment in which more than three automobiles shall be kept, stored, parked, placed or sheltered at any one time; and no person, firm or corporation shall keep, store, park, place or shelter more than three automobiles at any one time underneath any room, place or establishment used, occupied, operated, managed or let for living or sleeping quarters.

"Section 2. Any person, firm or corporation violating any of the provisions of this ordinance shall be fined in a sum not less than $1 nor more than $500, and each day's violation of this ordinance shall constitute a separate offense."

The plaintiff and appellant, Bellerive Investment Company, is a corporation, and is the owner and operator of a large family hotel and apartment building, containing about 300 rooms, situate at 214 East Armour Boulevard, within the corporate limits of said municipality. The plaintiff and appellant, Martha B. Bell, is the lessee and operator of a similar family hotel and apartment building, known as Rockhill Manor, containing about 100 rooms, situate at 43rd and Locust streets, within the corporate limits of said municipality. The plaintiff and appellant, Charles O. Jones, is the owner and operator of several similar apartment buildings, variously situated within the corporate limits of said municipality. The defendants and respondents herein. other than the municipal corporation named, are respectively, the mayor, the chief of police, the chief of the fire department, the chief inspector of the fire prevention division of the fire department, and the city counselor, of said municipality.

The petition alleges, among other matters:

"Plaintiffs further state that in the ownership, and operation, respectively, of the premises is included the business of renting out rooms and apartments in such respective buildings to families and other guests and apartment or room tenants; plaintiffs, respectively, as such owners and operators, providing heat, janitor and elevator service, and having charge of all the stairways, hallways, entrances, reception rooms and other parts of such buildings devoted to the common or joint use of themselves and tenants; and included in such for common use are spaces in the basements and lower parts of such

respective buildings, used for the keeping therein of automobile cars, belonging to plaintiffs' respective guests, and the providing and maintaining of such spaces, commonly known as garages, for private use of plaintiffs and their such guests and tenants, respectively, in said buildings is a necessary part of the said respective businesses of plaintiffs, and of the use and enjoyment of the said buildings, and such spaces in such garages for such automobiles, respectively, belonging to their said respective guests, are rented to such guests and tenants either as a part of the lettings or leases to such respective guests and tenants of the living rooms and apartments occupied by them respectively in such buildings; and such garage space lettings are made to all such guests and tenants as may desire the same, and a great number of the guests and tenants in each such respective buildings do so have included in, and do have so leased to them, spaces in such garages respectively for the purpose aforesaid;

"That plaintiffs, while separately owning and operating their said respective buildings, are in common position and interest in respect to the matters herein complained of and are similarly situated in respect thereto, and so they join in and bring this suit in behalf of themselves and all others similarly situated who may choose to join herein, and in the burden of this suit in respect to costs and expenses and the prosecution thereof and the relief sought;

"That plaintiffs, and all such other persons similarly situated, are entitled to the same relief against the matters herein complained of;

"Plaintiffs further state that in their said respective buildings in so operating, using and enjoying the same, they, as aforesaid, respectively, let living rooms and sleeping quarters in the stories and parts of such respective buildings over and above said garage spaces, and ordinarily and usually plaintiffs in each of said respective buildings rent spaces for, and there are kept therein, respectively, in each of said buildings, more than three automobiles; that the same are so kept, stored and parked therein for valuable consideration and under contracts therefor, as aforesaid, by the owners of said cars, who are at the same time guests and occupants of the living quarters, rooms and apartments in the upper part of such respective buildings;

"That each of the aforesaid buildings was erected and constructed, and began to be so used for the purposes above mentioned, long prior to March 30, 1923, except those of C. O. Jones erected in the year 1924, and have been so continuously used and occupied, including such garage spaces or quarters therein, for the purposes aforesaid since long prior to March 30, 1923, and each of said buildings, including those of C. O. Jones aforesaid, was erected and constructed in accordance with the laws of Missouri and with the charter and valid ordinances of Kansas City, Missouri, as the same were and existed at the time of the respective constructions and erections of

such buildings; and the same, and each of them, was lawfully and rightfully erected and constructed by plaintiffs or their grantors, respectively, the owners or lessors thereof;

"That the said buildings, and each of them, were erected and constructed under permits therefor, except those of C. O. Jones erected in the year 1924, issued by defendant, Kansas City, Missouri, through its building department, as provided by the city charter and ordinances, which said permits were issued upon proper applications therefor, and submissions, to the superintendent of buildings of said city, of the plans and proposed details and particulars of such buildings, including the spaces to be used as garages aforesaid in said buildings, and with specifications of such intended use and uses of said spaces for the keeping and maintaining, storing and parking of automobiles therein, and all such purposes and uses were made known and specified to said city and its officers having charge of such matters for it in, and with, the applications for permits for the erection and construction of such buildings and the same were approved by said city upon and by the issuance of said building permits;

"That nevertheless, afterwards, to-wit, on March 30, 1923, the defendant, Kansas City, by its common council and mayor, went through the form of undertaking to pass, and did pretend to pass, a certain ordinance known as City Ordinance No. 44950, which said pretended ordinance purports to have passed the upper house of said common council on March 19, 1923, and the lower house on March 26, 1923, and to be approved by the then mayor of said city, on March 30, 1923, . . . ;

"Plaintiffs further state that notwithstanding the premises, the defendants herein, being Kansas City, and its officers and officials herein named, as defendants, they concerting and acting together, are claiming that said ordinance is valid and enforceable, and that these plaintiffs, respectively, in so maintaining said garage parts of their buildings, and so using the same for the purpose of so keeping, parking and storing and sheltering more than three automobiles therein, are guilty of a breach of said ordinance and are subject to arrest, fine and imprisonment for such breaches, and are threatening to arrest and to undertake to prosecute, fine, and, if necessary, imprison these plaintiffs for such alleged breaches of such pretended ordinance, and have in fact arrested this plaintiff, Martha B. Bell, and M. J. Firey, a manager of this plaintiff, Bellerive Investment Company, for alleged breaches of said pretended ordinance, which arrests are in suits or actions brought by said city, one against said plaintiff, Martha B. Bell, and one against said M. J. Firey, manager of said plaintiff corporation, and defendants have notified each of the other of these plaintiffs and threatened that they, and each of them, will be arrested for alleged breaches of said pretended ordinance, and

the aforesaid cases are now pending in the Municipal Court No. 2 of said city, and are now set for trial on Thursday, May 28, therein, and the defendants are intending to and will prosecute said Martha B. Bell, and said M. J. Firey, as officer of plaintiff, Bellerive Investment Company, and these other plaintiffs, unless restrained and enjoined therefrom by the orders of this court;

"Plaintiffs will be irreparably damaged and will be greatly harassed and deprived of the enjoyment of their said respective properties unless the defendants are so enjoined and restrained;

"Defendants threaten and intend to make continued and repeated arrests from time to time of these plaintiffs, and some of them, notwithstanding appeals which may be taken, should plaintiffs, or any of them, be fined in either of said actions pending, or in others brought;

"Plaintiffs further state that many of their said guests and tenants will leave their said premises if they are not allowed to use said garage spaces so contracted to them by plaintiffs, respectively, and plaintiffs will be unable to obtain adequate and reasonable rent for their said premises;

"Plaintiffs further state that the acts and threatened acts of the defendants will cause a great multiplicity of suits and litigation and plaintiffs are without remedy at law."

The petitioners furthermore aver that the ordinance aforesaid is unreasonable, and therefore void, and that said ordinance is unconstitutional and void in that it contravenes, and is violative of Sections 4, 15, 20, 21 and 30, respectively, of Article 2, of the Constitution of Missouri, and Section 1, of Article 14, of the amendments to the Constitution of the United States.

The several defendants answered jointly, admitting the ownership and operation of the several and respective properties described in the petition by the respective plaintiffs; that the respective plaintiffs rent out rooms to guests, and furnish the services as stated in the petition; that, in operating their respective buildings, plaintiffs let, for a valuable consideration, living rooms and sleeping quarters above garage spaces in which more than three automobiles are kept, stored and parked; that the buildings of the respective plaintiffs were erected in accordance with the laws of Missouri and with the ordinances of Kansas City, and that the buildings of plaintiffs, Bellerive Investment Company and Martha B. Bell, were so used long prior to March 30, 1923, and that each of said buildings was erected under a building permit issued by said city, as alleged in the petition, and that the plans therefor showed the spaces to be used as garages for the storage of more than three automobiles, as alleged in the petition, but defendants deny that it was made known and specified to the defendant municipality, or to its officers, that the said spaces were

to be used as alleged in the petition. The defendants, by their answer, also deny that the use of the spaces in the lower parts of plaintiffs' respective buildings for keeping and storing automobile cars is a necessary part of the respective businesses of plaintiffs, and of the use and enjoyment of said buildings. The answer admits the due enactment and approval of the ordinance in controversy, but denies the invalidity or unconstitutionality of said ordinance.

On the trial of the action upon the merits, it was agreed by the parties that all facts averred in the petition shall be taken and considered by the court as true. The defendants offered the testimony of certain witnesses, the substance of which testimony is hereafter stated.

Emmett Scanlon, the chief inspector of the fire prevention bureau of Kansas City, testified that, in pursuance of his official duties, he had inspected the premises and buildings of the respective plaintiffs; that, in the basement and under the sleeping quarters in each of said buildings and premises, is located a room or compartment which is, and had been for a long time past, used as a garage or storage quarters for automobiles; that the automobiles stored in said compartments or rooms are driven therein under their own power, and, under their own power, are moved from place to place in said compartments or rooms, the purpose of such movement being to arrange and locate said automobiles so as to facilitate the storage of as large a number of automobiles as is practicable in the space provided; that said automobiles so stored and kept in said compartments or rooms are removed therefrom under their own power, the said automobiles being driven in and out of said compartments daily; that the automobiles so stored in said compartments, and so driven in, moved from place to place, and driven out therefrom, contain, while in said compartments, gasoline in varying quantities stored in the tanks of such automobiles; that they contain lubricating oils in various parts of the mechanism of such automobiles, and, as part of their mechanism, they have and maintain electric storage batteries, which are charged and alive during the period of such storage; that the usual and common condition and result from the storage of automobiles so containing lubricating oils is that there is a dripping of oil therefrom to the floor of the rooms or compartments wherein the same are stored; that, where automobiles are so stored with gasoline in their containers, there is a constant danger and possibility that the gasoline therein contained will drip or leak from the automobile to the floor of said garage, and, in doing so, that the same will immediately and rapidly vaporize, thereby forming an inflammable and highly explosive gas; that there is a constant danger of the existence of a defect or aperture in the container, or in the mechanism through which such gasoline is conducted from the container to the engine of such

automobile, and that the existence of such a defect or aperture re-sults in the vaporization of a portion of the gasoline contained in such automobile, thereby creating a highly inflammable and explosive gas; that the forming and accumulation of such vapor or gas, in compartments wherein such automobiles are stored, creates a danger-ous and hazardous condition by reason of the fact that the same may be ignited upon coming in contact with a flame or spark of any character; that automobiles so stored with electric storage batteries therein are, through defects in the mechanism thereof, liable to pro-duce such flame or spark as is necessary to ignite the highly in-flammable and explosive gases and vapors above mentioned, and that the engines of such automobiles, upon being started or put in motion, are likely to create or produce such flame or spark as will so ignite such gases; that the existence of oil on the floor of such compartments, and the existence of such vapors or gases, creates and maintains a hazardous situation or condition by reason of the fact that they may come in contact with a spark or flame, through the carelessness and negligence of persons in or about such compartments, and thereby be ignited, and they may come in contact with a spark or flame through a defect in the electrical wiring in and about such compartments, and thereby become ignited; and that, where automobiles are so stored, kept and maintained in such compartments or rooms, the hazard and danger of fire and explosion is increased in a very rapid proportion as the number of automobiles so stored therein is in-creased.

Alex Henderson, then chief of the fire department of Kansas City, testified that he had been connected with such department of said city for a period of fifty years, and that he had attended and directed the fighting and extinguishing of many fires resulting from the burn-ing of automobiles located in garages; that he had observed that, where such burning automobiles contain oil or gasoline, the fire is one of great hazard, and difficult to extinguish; that, in such burning, violent and repeated explosions result, with an excessive volume of smoke, fumes and gases; that, where such burning automobiles are beneath, or in the basement of, a building or structure, it is difficult and dangerous for the members of the fire department to approach such structure closely enough to properly and efficiently resist and extinguish the fire therein; that the burning of an automobile itself, irrespective of oil or gasoline contained therein, produces an excess of smoke or gas, which is of an extremely suffocating nature; that a structure or building containing a burning automobile has a tendency to fill very rapidly with smoke, fumes and gases of a highly suffocat-ing nature, thereby immediately endangering the lives of persons within such building or structure: that it is possible and probable that an explosion in the basement of such a building or structure,

resulting from the ignition of vapor or gas created by the vaporization of gasoline, would partially, or even totally, wreck such building without creating a fire therein; that the fighting and extinguishing of a fire caused by the burning of automobiles containing oil and gasoline is one of great difficulty, by reason of the fact that water, and other usual and customary means of extinguishing fire, has no efficient effect thereon, and that sprinkler systems, as ordinarily installed, are not efficient means of prevention of fire, because such systems may be wrecked and rendered inefficient by the explosions incident to such fires; and that the hazard of such fires, and the difficulties in fighting and extinguishing the same, increase in rapid proportion to the number of automobiles involved in such fire.

J. O. Gill, manager of the Missouri Fire Inspection Bureau at Kansas City, testified that he had familiarized himself with the hazard and danger of fire resulting from, and connected with, various uses and occupancies of buildings and structures, and that the keeping, storing, parking, placing or sheltering of automobiles in a building or structure, increases the danger and hazard of fire in such building or structure and increases the possibility of the destruction of such building in the event a fire originates therein; that such increased danger or hazard of fire is recognized by all fire insurance companies, and the premium rate for fire insurance on such building, or on the contents thereof, is increased accordingly; that the existing premium rate for fire insurance on a building (of the character and kind herein) in contemplation of the storage therein of six, or more, automobiles is $1.69 per $100 of insurance; and in the event of the storage in such building of more than three, and less than six automobiles, the existing premium rate is $1.14 per $100 of insurance; and in the event of the storage in such building of three, or less, automobiles, the existing premium rate is 66 cents per $100 of insurance; and in the event that no automobile is stored or kept in such building, the existing premium rate for fire insurance is 56 cents per $100 of insurance.

Walter A. Besecke, superintendent of buildings of Kansas City, testified that a building permit was issued by said department of the city on January 24, 1922, granting permission to the Bellerive Investment Company to erect an apartment hotel on East Armour Boulevard in Kansas City, to be located on lots 1 to 5, block 13, Hyde Park Addition; that such building was subsequently erected by virtue of said permit, and that said building is being operated, and is known, as the Bellerive Hotel in Kansas City; that, at the time of the application for the permit for the erection of said building, there were filed in witness's office blue print plans of the proposed building, which plans are in the custody and charge of witness; that such

plans show a space, room or compartment in said building to be used as a garage for the storage of automobiles, but that no portion of such room, space or compartment is shown on such plans to be under a part of the building which, according to the plans thereof on file in witness's office, is designated or specified to be occupied as living or sleeping quarters; and that building permits were issued by the office of said superintendent of buildings on August 21, 1924, to plaintiff, Charles O. Jones, for the erection of the several buildings owned and operated by said plaintiff.

The plaintiffs offered no evidence upon the trial of the cause.

After the hearing and submission of the cause upon the merits, the trial court found the issues for the defendants and against the plaintiffs, and denied the writ of injunction sought by the plaintiffs, and the court ordered and adjudged that the several defendants go hence without day, and that they recover of the plaintiffs the costs of the action. In due time, the plaintiffs filed their separate motions for a new trial and in arrest of judgment, upon the overruling of which motions by the trial court, the plaintiffs were allowed an appeal to this court from the judgment entered.

We retain jurisdiction of the appeal because of the constitutional questions presented by the petition, and renewed in the course of the trial, and in the motions for new trial and in arrest of judgment.

I. It is insisted by the several appellants herein that the aforementioned and quoted ordinance of Kansas City, No. 44950, which  took effect and became operative on March 30, 1923, the date of its approval by the then mayor of said city, is violative of the provisions of Sections 4, 20, 21 and 30, of Article 2, of the Constitution of Missouri, and that it likewise contravenes Section 1, of Article 14, of the amendments to the federal Constitution, in that the enforcement of said ordinance against the appellants amounts to the taking or damaging of their respective properties, and of their rights of free and full enjoyment and user thereof, without due process of law, and without providing for, or tendering, the payment of compensation for such taking or damaging of their respective properties and property rights for a public use; hence, error is assigned in the entering of judgment *nisi* in favor of the defendants and against the plaintiffs, the resultant effect of such judgment being to hold that the ordinance in controversy is constitutional and valid, and therefore is effective, operative, and enforceable, as against the several appellants herein.

It may pertinently be noted and stated herein that the appellants do not attack or question the validity of the ordinance in controversy upon the ground that the municipality of Kansas City had no power

or authority, under its charter, to enact such ordinance, or to legislate upon the subject-matter of the ordinance. We make this observation for the reason that we are mindful that there are respectable judicial authorities to the effect that a municipal corporation, as such, has no inherent power or authority to enact police regulations, but can exercise only such police powers as are fairly included in the grant of powers conferred upon the municipality by its charter. We therefore start with the assumption and premise that the grant of powers, as contained in the then existing and effective charter of Kansas City, authorized and empowered the legislative branch of the government of that municipality to enact, and the chief executive officer of said city to endorse his approval upon, the ordinance here in question.

It has been definitely and clearly established and settled, by the decisions of this court and of the federal Supreme Court, that a statute, or a municipal ordinance, which is fairly referable to the police power of the State or municipality, and which discloses upon its face, or which may be shown *aliunde*, to have been enacted for the protection, and in furtherance, of the peace, comfort, safety, health, morality, and general welfare of the inhabitants of the State or municipality, does not contravene or infringe the several sections of the state and federal Constitutions invoked by the appellants herein, and cannot be held invalid as wrongfully depriving the appellants of any right or privilege guaranteed by the Constitution, state or federal; the reason and basis underlying such decisions being that the personal and property rights of the individual are subservient and subordinate to the general welfare of society, and of the community at large, and that a statute or ordinance which is fairly referable to the police power has for its object the "greatest good of the greatest number." [St. Louis Gunning Advertising Co. v. St. Louis, 235 Mo. (en banc) 99; State ex rel. Oliver Cadillac Co. v. Christopher, 317 Mo. (en banc) 1179; Armour & Co. v. North Dakota, 240 U. S. 510; Cusack Co. v. City of Chicago, 242 U. S. 526; Village of Euclid v. Ambler Realty Co., 272 U. S. 365; Zahn v. Board of Public Works, 274 U. S. 325; Gorieb v. Fox, 274 U. S. 603.]

The question which is immediately presented for our consideration and decision, therefore, is whether the ordinance in question is fairly referable to the police power of the respondent municipality, and whether the expressed requirements or regulations of the ordinance have a substantial and rational relation to the health, safety, peace, comfort and general welfare of the inhabitants of the municipality. If such question may be answered in the affirmative, then, under the decisions of this court, and of the federal Supreme Court, above cited, the ordinance cannot be held to infringe the constitutional rights and guaranties invoked by the appellants, unless it well can

be said that the ordinance "passes the bounds of reason and assumes the character of a merely arbitrary *fiat.*" [Purity Extract Co. v. Lynch, 226 U. S. 192, 204.]

The appellants urge that the ordinance does not disclose upon its face that it is referable to the police power of the municipality; that there is no declaration of a nuisance therein; and that the ordinance merely prescribes a penalty for its violation. We are of opinion, however, that an ordinance which prescribes a police regulation need not expressly recite the fact that it is enacted in pursuance of the police power of the municipality. [State v. Cantwell, 179 Mo. 245, 260; Little River Drainage District v. Railroad Co., 236 Mo. 94, 111; Morrison v. Morey, 146 Mo. 543, 563.] Mr. FREUND, in his standard text on The Police Power, Public Policy and Constitutional Rights (1904), Section 146, page 135, says: "If the danger exists an express legislative declaration of the fact is not necessary; it is sufficient that it appears from the provisions (of the law or ordinance). Even where the subject-matter of a law must be stated in its title, an express reference in it to health or safety is not necessary." As is aptly said by Mr. Justice McKENNA in Armour & Co. v. North Dakota, 240 U. S. 510, 513, in discussing a statute presumably enacted under the police power of the State of North Dakota: "Nor do the courts have to be sure of the precise reasons for the legislation or certainly know them or be convinced of the wisdom or adequacy of the laws. [Rast v. VanDeman & Lewis Co., 240 U. S. 342; Tanner v. Little, 240 U. S. 369.]" As a general rule, an ordinance or resolution need not state or explain the reasons for, or the exigency which occasioned, its enactment. [43 C. J. 526; Young v. St. Louis, 47 Mo. 492; Kiley v. Forsee, 57 Mo. 390.] Nor is it essential that the law or ordinance shall specifically find or declare the subject-matter regulated therein to be a nuisance. As is said in Ex parte Quong Wo, 161 Cal. 220, 118 Pac. 714, 717, and quoted approvingly by this court, en banc, in St. Louis v. Evraiff, 301 Mo. 231, 242: "It must be admitted, of course, that the business of conducting a public laundry is a lawful and necessary occupation, and that such a laundry is not necessarily a nuisance *per se.* But this fact alone does not prevent the enactment of such regulations regarding it as may be reasonably found necessary for the safety, health, and comfort of society at large. There are many lawful and necessary occupations, not constituting nuisances *per se,* as to which such regulations by a city have been found necessary. It was said in Ex parte Lacey. 108 Cal. 326, 41 Pac. 411, 38 L. R. A. 640, 49 Am. St. 93, involving the question of the validity of an ordinance prohibiting the operation of any steam shoddy machine, or steam carpet-beating machine, within one hundred feet of any church, schoolhouse, or dwelling house;

'Indeed, as to nuisances *per se,* the general laws of the State are ample to deal with them. But the business here involved may properly be classed with livery stables, laundries, soap and glue factories, etc., a class of business undertakings in the conduct of which police and sanitary regulations are made, to a greater or less degree, by every city in the country.' ''

In the Slaughterhouse Cases, 83 U. S. 36, 62, Mr. Justice MILLER said, in discussing the sources and extent of the police power: '' 'Unwholesome trades, slaughterhouses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and the burial of the dead, may all,' says Chancellor Kent (2 Commentaries, 340) 'be interdicted by law, in the midst of dense masses of population, on the general and rational principle that every person ought so to use his property as not to injure his neighbors; and that private interests must be made subservient to the general interests of the community.' This is called the police power; and it is declared by Chief Justice SHAW that it is much easier to perceive and realize the existence and sources of it than to mark its boundaries, or prescribe limits to its exercise. This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. 'It extends,' says another eminent judge, 'to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State; . . . and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State. Of the perfect right of the Legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' ''

Nor does the mere fact that the ordinance, in Section 2 thereof, prescribes only a pecuniary penalty, by way of a fine to be assessed against a violator of its provisions, render the ordinance any other than a police regulation, referable to the police power of the municipality. The power to punish by pecuniary penalty or fine is generally held to be implied from the power to enact police ordinances or regulations. [43 C. J. 265; St. Louis v. Sternberg, 69 Mo. 289, 302; St. Louis v. Green, 70 Mo. 562.] Consequently, it cannot well be said, we think, that the ordinance in controversy is any the less referable to the police power of the municipality because it does not specifically declare the subject-matter of the ordinance to be a nuisance, and does not provide for the abatement thereof, but merely

prescribes a pecuniary penalty or fine for violation of the requirements and regulatory provisions of the ordinance.

The jurisprudence of this State abounds with decisions wherein statutes and ordinances have been held to be fairly referable to the police power of the State or the municipality, and therefore have been held not to invade or transgress the constitutional rights and guaranties of persons, natural or corporate, charged with the violation of such statutes and ordinances. We cite a few of such decisions by way of illustration: State v. Searcy, 20 Mo. 489, upholding the constitutionality of a statute prohibiting the sale of intoxicating liquors without a license; Morrison v. Morey, 146 Mo. 543, upholding the constitutionality of a statute authorizing the organization of a levee district, and assessing the cost of the construction of levees therein against the lands benefited; Ex parte Lucas, 160 Mo. 218, upholding the constitutionality of a statute regulating the business or occupation of barbering; Lore v. Manufacturing Co., 160 Mo 608, upholding the constitutionality of a statute requiring belting, shafting, gearing, and drums in manufacturing establishments to be safely and securely guarded; City of St. Louis v. Galt, 179 Mo. 8, declaring the constitutionality of a municipal ordinance which made the owner or occupant of a lot, upon which a growth of weeds to the height of over one foot is allowed to remain uncut, guilty of a misdemeanor, and punishable by a fine or pecuniary penalty; State v. Cantwell, 179 Mo. 245, upholding the constitutionality of a statute prohibiting the working of mine laborers underground for more than eight hours in one day, and prescribing a pecuniary penalty or fine for violation of the statute; City of St. Louis v. Leissing, 190 Mo. 464, upholding the constitutionality of a municipal ordinance prescribing a standard of purity of milk and cream sold within the city, and fixing a pecuniary penalty or fine for the violation of such ordinance; Ex parte Smith, 231 Mo. 111, declaring the constitutionality of a municipal ordinance requiring an application for a license before engaging in the occupation of plumber, the applicant to be examined as to his qualifications and fitness by a board of examiners, and prescribing a pecuniary penalty for violation of the ordinance; Little River Drainage District v. Railroad Co., 236 Mo. 94, declaring the constitutionality of a statute providing for the reclamation of swamp and overflowed lands; State v. Railway Co., 242 Mo. 339, declaring the constitutionality of a statute requiring corporations engaged in business in this State to pay their employees as often as semi-monthly, and fixing pecuniary penalties for violation thereof; State ex inf. v. Merchants' Exchange, 269 Mo. 346, upholding the constitutionality of a statute providing for the inspection, weighing and grading of grains, and fixing penalties, by way of fine and imprisonment, for violation thereof; Kansas City v. Holmes, 274 Mo. 159, declaring the constitutionality of a municipal ordinance requir-

ing owners of realty to remove snow and ice from public sidewalks, and fixing a pecuniary penalty for violation thereof; St. Louis Gunning Advertising Co. v. St. Louis, 235 Mo. 99, upholding the constitutionality of a municipal ordinance regulating the size, location, construction and maintenance of billboards. And very recently this court, en banc, though by a divided vote of its then constituted membership, in State ex rel. Oliver Cadillac Co. v. Christopher, 317 Mo. 1179, has upheld the constitutionality of a municipal ordinance imposing restrictions upon, and regulating the use of, real property, privately owned, in certain prescribed zones or districts within the corporate limits of the municipality, the majority of this court as then constituted being of the opinion that such ordinance, although, perhaps, bordering somewhat upon aestheticism as one of the basic reasons for its enactment, is nevertheless fairly and broadly referable to the police power of the municipality, and is a valid exercise of such power, which view is in accordance with the predominant and modernistic judicial opinion of other jurisdictions, state and federal, In many, if not most, of the cases just cited, the statute or ordinance involved contained no express legislative declaration, recital, or finding, that the enactment is referable to the police power of the State or municipality, or that the object and purpose of the enactment was in furtherance, or protection, of the health, safety, or general welfare of the community at large; and, in most of the cases cited, the subject against which the enactment was directed was not declared, in terms, to be a nuisance, or required to be abated, but violation of the enactment was made punishable by a pecuniary penalty or fine.

The evidence herein stands uncontradicted and uncontroverted upon the record before us that automobiles, which are ordinarily and customarily driven under their own power, contain gasoline, lubricating oils, and electrical storage batteries; that there is a continuous and constant danger and possibility that gasoline and lubricating oils will drip or leak from such automobiles to the floor of the compartments within which they are kept, parked, or stored; that the tendency of such gasoline and oils is to rapidly vaporize, thereby forming highly inflammable, volatile and explosive gases; that the accumulation of such vapors and gases creates a dangerous and hazardous situation and condition, in that such vapors and gases may readily be ignited when coming in contact with a flame or spark, which may be occasioned through the carelessness of persons in and about such compartments, or from putting into operation the engines of such automobiles, or from defects in the electrical storage batteries, or other mechanical parts and appliances, of such automobiles; that fires or conflagrations which originate under such circumstances and conditions are extremely hazardous and difficult to extinguish, and often result in repeated and violent explosions, accompanied with excessive volumes of smoke, fumes, and gases of an extremely suf-

focating nature; that a structure or building containing a burning automobile, irrespective of oil or gasoline therein, has a tendency to fill very rapidly with smoke, fumes and gases of a highly suffocating nature, thereby immediately endangering the lives of persons within such building or structure; that the customary method of fighting and extinguishing such fires and conflagrations, by means of water, has no efficient effect thereon; that the difficulties in fighting and extinguishing such fires are increased in rapid proportion to the number of automobiles involved in such fires; that the keeping, storing, parking, placing or sheltering of automobiles in a building or structure increases the danger and hazard of fire therein, and increases the possibility of the destruction of such building in the event of a fire originating therein; that such increased danger or hazard of fire is recognized by all fire insurance companies; and that the premium rate of fire insurance on any such building, and its contents, is increased more than proportionately according to the number of automobiles stored, parked or kept in any such building.

Viewing the ordinance in controversy in the light of the uncontradicted and uncontroverted evidence herein, we are of opinion that the ordinance is fairly referable to the police power of the respondent municipality as having been enacted for the protection, and in furtherance, of the peace, comfort, health, safety and general welfare of the inhabitants of said municipality; and hence we find and conclude that such ordinance (unless it well can be said to be wholly unreasonable and arbitrary in its effect and application) does not infringe the constitutional rights and guaranties invoked by the several appellants herein.

We might say, furthermore, that it is a matter of common (though, maybe, not of judicial) knowledge, since the advent of the automobile, and the garage necessary for its storing and keeping, that disastrous fires have occurred in several municipalities situate throughout the nation, resulting not only in large property loss and damage, but resulting also in loss of human life, and that such fires originated in buildings or structures wherein a number of automobiles were permitted to be kept, parked, or stored in garages or compartments located underneath the living or sleeping quarters used and tenanted by human beings. It is reasonable to assume that knowledge of such fires and fatalities on the part of the municipal officers, and the members of the common council, of Kansas City doubtless gave occasion to the enactment of the ordinance here in controversy. Indeed, if such a fire and resulting casualty should occur, under the circumstances and conditions against which the ordinance is directed, the municipal authorities might properly, and morally, at least, be criticisable and, maybe, blamable, in the event of their failure to regulate, by the enactment and enforcement of such an ordinance or police regulation as is herein involved, the

possible source of such danger and hazard to property and, human life. An occurrence which is still fresh in the memory of the residents of Kansas City, and which was widely heralded at the time in the public press of the land, was the comparatively recent conflagration and burning of the American Royal Live Stock Pavilion, a supposedly fire-proof structure located in said city, which fire occurred and originated during the annual automobile show or exhibition, and resulted, in a very brief period of time, in practically the total destruction of the structure, together with several hundred automobiles, and accessories, on exhibit therein, entailing a property loss aggregating thousands of dollars. Such an occurrence, to say the least, affords some reason and basis for the wisdom of enacting and enforcing an ordinance like the one here in controversy.

II. Appellants urge, however, that the ordinance in controversy is unreasonable and arbitrary upon its face, and should be held void upon that ground. It is claimed by appellants that the numerical limitation (more than *three* automobiles) prescribed by the ordinance is purely and wholly arbitrary, and that there is no reasonable or sound basis for the numerical limitation prescribed. The uncontroverted evidence herein, as we have said, tends to show that the danger of fire is rapidly increased according to the number of automobiles kept, stored or parked within one compartment, structure, or building, and that fire insurance companies, from their experience, recognize the increased hazard of fire where three, or even a less number of, automobiles are kept or stored within a building or structure, and that such hazard rapidly increases according to the number of automobiles kept, stored or parked in any such building or structure, as is further evidenced by the premium rates of fire insurance on such building, or its contents, which, as is shown by the evidence, increase quite materially as the number of automobiles stored or kept in any such building exceeds three. In Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, Mr. Justice VAN DEVANTER, speaking for the federal Supreme Court, and announcing the well-recognized rules by which the constitutionality of statutes similar in character to the ordinance here involved are tested, said: "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to *classify* in the adoption of police laws, *but admits of the exercise of a wide scope of discretion in that regard,* and avoids what is done only when it is without *any* reasonable basis, and therefore is purely arbitrary. 2. A classification having *some* reasonable basis does not offend against that clause *merely because it is not made with mathematical nicety* or because in practice it results in *some*

inequality. 3. When the classification in such a law is called in question, *if any state of facts reasonably can be conceived that would sustain it,* the existence of that state of facts at the time the law was enacted must be assumed. 4. *One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis,* but is essentially arbitrary.'' [Italics our own.] We are unable to say that there is no reasonable basis for the numerical limitation or classification (more than *three* automobiles) prescribed by the ordinance in controversy, regardless of whether or not such numerical limitation is made with mathematical nicety; nor have the appellants herein carried and sustained the burden of showing that the ordinance is essentially and purely arbitrary in its effect and application, and that it is not bottomed upon any reasonable basis or foundation.

It is also claimed by appellants that the ordinance is unreasonable, and therefore void, because it does not distinguish or differentiate between automobiles containing oil, gasoline and electric storage batteries, and automobiles not containing motive fuel, lubricants and electrical equipment; or, in other words, and using the parlance of the automobile trade, it would appear to be the claim of appellants that the ordinance does not distinguish, or differentiate, between the storage, keeping, placing or sheltering of ''dead'' automobiles and ''live'' automobiles. It is argued by appellants that the ordinance might have prohibited, with as much semblance or pretense of reason, the keeping, storing or sheltering of empty tin cans, sewing machines, or farm wagons, and that an automobile not containing gasoline, lubricating oils, or electrical equipment, is just as harmless as the wholly harmless things just mentioned by way of illustration and argument. The noun ''automobile,'' however, although of comparatively recent use and origin, had at the time of the enactment of the ordinance, a well known meaning, acceptation, and use. It is defined by lexicographers thus: ''An automobile vehicle or mechanism; a self-propelled vehicle suitable for use on a street or roadway. Automobiles are usually propelled by internal combustion engines (using volatile inflammable liquids, as gasoline or petrol, alcohol, naphtha, etc.), steam engines, or electric motors.'' [Webster's New International Dictionary.] The adjective ''automobile'' is defined as ''containing means of propulsion within itself; self-propelling; as, an *automobile* torpedo, car or vehicle.'' It is a self-evident physical law that an inanimate vehicle cannot be self-propelling unless containing within its mechanism some motive fuel, or like means, from which to obtain the power of propulsion. We think that the noun ''automobile,'' as used in the ordinance in controversy, must be given its usual, ordinary, and common acceptation and meaning, and that it is reasonable to assume that the municipal officers, in enacting the ordinance, intended to ascribe to the word ''automobile'' its usual,

ordinary, and common meaning, namely, a vehicle containing within its mechanism the motive fuel or means of self-propulsion. One of the cardinal rules of statutory interpretation and construction is that words in common use are to be construed in their natural, plain, and ordinary signification and acceptation. [36 Cyc. 1114; McFarland v. Railway Co., 94 Mo. App. 336, 340.] A somewhat similar contention was made by the defendant and appellant in City of St. Louis v. Galt, 179 Mo. 8, 13, involving the validity and constitutionality of a municipal ordinance which made the owner, lessee, or occupant of a lot of ground, who shall allow or maintain on any such lot any growth of weeds to a height of over one foot, guilty of a misdemeanor, and punishable by a pecuniary penalty or fine. The evidence therein tended to show that there were weeds growing on defendant's lot in violation of the ordinance, and that about one-third of the weeds were sunflowers. It was urged by the defendant therein that the ordinance, if intended to prohibit the growing of sunflowers on lots of ground, was unreasonable and arbitrary. Said this court, in ruling the contention, speaking through MARSHALL, J.: "The word 'weed' has a common, everyday, meaning to the mind of every man. . . . It is manifest, therefore, that the city ordinance did not intend to restrict the lexicographer's definition of the word, nor to give an exclusive meaning to it. So that the defendant may have been guilty of a violation of Section 608, by permitting weeds, as they are commonly known to mankind and to the lexicographers, to grow on his lot, although such weeds may not fall within the inclusive definition of Section 612 of the Municipal Code of St. Louis. . . . A critical analysis of the evidence, however, fails to convince the impartial mind that either the ordinance or the evidence was leveled at the famous, emblematic flower, which is so sacred to the defendant. The offense proved would be just the same if the sunflowers be eliminated from consideration, and if the defendant had obeyed the notice from the health commissioner by cutting the weeds and leaving the sunflowers, he would, probably, not have been proceeded against; or, at any rate, would not have been the appellant in this case."

But assuming, as is seemingly contended by the appellants, that the ordinance in question is intended and leveled as well against the keeping, storing, parking, placing or sheltering of more than three "dead" automobiles, as against the keeping, storing, parking, placing or sheltering of more than three "live" automobiles, at any one time underneath any room, place, or establishment used, occupied, operated or let for living or sleeping quarters, nevertheless, we cannot say that the ordinance is unreasonable and purely arbitrary in its effect and application. There was some evidence adduced by the respondents, and uncontroverted by the appellants, to the effect that the burning of an automobile, irrespective of oil or gasoline con-

tained therein, produces an excessive volume of smoke or gas, which smoke or gas is of an extremely suffocating nature, and that a structure or building wherein such burning automobiles are kept, parked or stored has a tendency to fill very rapidly with smoke, fumes and gases of a highly suffocating nature, thereby immediately endangering the lives of those persons who may be within the building or structure. Nor can we say (although we are not to be understood as deciding such question herein) that an ordinance which inhibits the storing or keeping of any specified class of things in any considerable number or amount, whether those specified things be empty tin cans, sewing machines, farm wagons, furniture, waste paper, rags, explosives, or whatnot (to use the illustration of appellants), at any one time underneath any room or establishment used, occupied or let for living or sleeping quarters, is necessarily and essentially unreasonable and purely arbitrary, especially in the light of uncontroverted evidence *aliunde* that such specified and inhibited things have a tendency, when burning, to produce or throw off an excessive volume of smoke and fumes of an extremely and highly suffocating nature. It may be that an ordinance which attempts to inhibit the keeping or storing of any class of specified things in a considerable number or amount in *any* place or establishment whatsoever might properly be subject to the merited contention and claim that it is unreasonable and arbitrary in its effect and application, but, where the inhibition against the keeping or storing of the class of specified things is limited by the terms of the ordinance (as in the instant case) to a place *underneath any room, place or establishment used, occupied, or let for living or sleeping quarters,* then the ordinance is to be viewed and construed in an entirely different light, and whether the ordinance is unreasonable and purely arbitrary in its effect and application depends upon the purpose and object of its enactment, and the dangers and hazards to society or humanity at large at which it is directed, as disclosed either upon the face of the ordinance, or by evidence *aliunde.* [43 C. J. 312; City of Windsor v. Bast (Mo. App.), 199 S. W. 722; Cusack Co. v. Chicago, 267 Ill. 344, 349.] In other words, the reasonableness or unreasonableness of an ordinance is to be determined from the whole and entire terms and provisions of the ordinance in the light of the evils, dangers, or hazards at which it is aimed and directed. As is said in 43 Corpus Juris, 308: "The courts will have regard to all the circumstances and subjects sought to be attained, and the necessity which exists for the regulation."

Furthermore, the presumption is always in favor of the reasonableness of a municipal ordinance or regulation, and every intendment is to be made in favor of the reasonableness of the exercise of municipal power to make regulations pursuant to, and in promotion of, its police powers; and the burden of proof to show the unreason-

ableness of a municipal ordinance or regulation rests upon the person asserting it, unless, of course, its unreasonableness is apparent upon it face. [43 C. J. 310, 311.] As is aptly said in Harrigan v. Burton, 224 Mich. 564, 569, 195 N. W. 60: ''The generally accepted rule is that a presumption prevails in favor of the reasonableness and validity in all particulars of a municipal ordinance unless the contrary is shown by competent evidence, or appears on the face of the enactment." It is said by our own court, in St. Louis v. Theatre Co., 202 Mo. 690, 699: ''It is true that a court can declare an ordinance unreasonable upon its face, by a mere inspection of the ordinance. if the ordinance upon its face chances to be of that character. [City of Hannibal v. Telephone Co., 31 Mo. App. l. c. 32, and cases cited.] But courts move cautiously in such cases. [Commonwealth v. Robertson. 5 Cush. 438.] And it is further true that the courts can and will declare ordinances unreasonable, upon the showing of a state of facts which makes them unreasonable. [Citing cases.] . . . *Unless the unreasonableness of the ordinance is apparent upon the face thereof, the burden is upon the person asserting it to be unreasonable to so show by the facts.* These facts have not been developed in this case. . . . To our mind, the party attacking the validity of an ordinance upon the ground of its unreasonableness must clearly show the facts, before the courts can act." [Italics our own.] To like effect are the rulings in St. Louis v. Railways Co.. 263 Mo. 387, 456; Hislop v. Joplin, 250 Mo. 588, 599; City of Windsor v. Bast (Mo. App.), 199 S. W. 722, 723.

The evidence offered on behalf of the respondents herein tended to show the reasonableness of the ordinance in question, and that evidence stands uncontroverted by the appellants upon the record before us. The appellants offered no evidence tending to show the unreasonableness of such ordinance; in truth, the appellants proffered no evidence whatsoever, other than the mere allegations of the petition, which, by agreement of the parties, are to be taken as true as respecting only the matters of fact charged in the petition. The facts averred in the petition do not tend to show that the ordinance is unreasonable or purely arbitrary in its effect and application; nor does the unreasonableness of the ordinance appear upon its face. The appellants have failed to sustain the burden of clearly showing any fact upon which the unreasonableness of the ordinance can be inferred or declared, and therefore the presumption that the ordinance is reasonable and rational has not been overthrown by any evidence in the record before us. Again, it has been ruled that where the unreasonableness or arbitrariness of an ordinance is fairly debatable, the court will not substitute its own judgment for that of the legislative body charged with the primary duty and responsibility of determining the question. [Zahn v. Board of Public Works, 274 U. S. 325, and cases there cited; Hislop v. Joplin, 250 Mo. 588, 599, and cases cited.]

It may be that the enforcement of the ordinance against thes° appellants, and others in like situation, may deprive them of some use and enjoyment of their properties, and thereby likewise deprive them of a source of revenue from the inhibited use of such properties, but such fact and circumstance, in and of itself, does not render the ordinance unreasonable, invalid, or unconstitutional. As forcibly and pertinently expressed in State ex rel. v. Harper, 182 Wis. 148, 153, and quoted approvingly in Miller v. Board of Public Works, 195 Cal. 477, 488, in upholding the constitutionality of the zoning or city-plan ordinances of the cities of Milwaukee and Los Angeles, respectively: "It is thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property he may not do with it as he pleases, any more than he may act in accordance with his personal desires. As the interest of society justifies restraints upon individual conduct, so also does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect iself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare."

Our own court has said, in St. Louis v. Commission & Investment Co., 226 Mo. 148, 155, speaking through our lately departed and lamented brother and associate, Judge GRAVES, who, during his many years of judicial service upon this court, and upon the *nisi prius* court, as well, was ever the champion and exponent of the constitutional rights and guaranties of the individual as against the illegal and unconstitutional invasion of such rights and guaranties by the State or the municipality: "The safety of life and property as against the ravages of fire has always been a live question in municipalities. The city government has to deal with the question not from the standpoint of the individual owner of a particular property, but from the standpoint of the general welfare of the city and its citizenship Ordinarily, the citizen has the right to use that which is his own, in such a manner as he pleases, but if the use thereof seriously affects the general public, society and the laws thereof demand a surrender of a part of the individual rights for the general welfare of the public, for such is the basis of all government. Absolute individual rights is anarchy. So that we say that in cities fire limits may be established, and thereafter certain character of buildings must be erected—a limitation upon the broad individual rights of the citizen to use his own property as he pleases. So, too, we say to the owner of property in a municipality, 'Many things must be done by you

to the end that the general welfare may be promoted.' An enumera-
tion would be superfluous.'' And the same learned jurist, again
speaking for this court, en banc, in State ex inf. v. Merchants' Ex-
change, 269 Mo. 346, 356, has said: ''Many laws seemingly work
hardships upon persons and their business, but this is no excuse for
the violation of the law. . . . Of all the members of this court
the writer has been most loth to extend the police powers of the
State. [Vide, concurring opinion in State v. Railroad, 242 Mo. 1. c.
376, and dissenting opinion in State ex rel. v. Vandiver, 222 Mo. 1.
c. 255.] Yet in all that I may have written, the doctrine that pri-
vate rights may be made subservient to the public welfare is thorough-
ly recognized.''

In passing upon the constitutionality and the reasonableness of
ordinances of the kind and character of the one here in controversy,
the courts must also take into consideration the complexity of urban
living and housing conditions of the present day and generation. It
is indisputably a matter of general and common knowledge that the
modern mammoth apartment building, or hotel, whether serving the
family of the local resident or the transient guest, in the two largest
cities of our State, ofttimes houses, and accommodates with living and
sleeping quarters, a number of persons which equals, or exceeds, the
entire population of many, if not most, of the towns and villages of
the State. Under such conditions and circumstances, a fire or con-
flagration in a single such building or structure would immediately
jeopardize as many human lives as are contained within the con-
fines of one of our rural villages and towns. It follows, therefore,
that a police regulation or ordinance which may be wholly unreason-
able and invalid, as applied to a rural community, may be entirely
reasonable and valid, as applied to a city of the size and population
of St. Louis or Kansas City. As is well and pertinently said by Mr
Justice SUTHERLAND, delivering the opinion of the Supreme Court
of the United States in the recent case of Village of Euclid v. Ambler
Realty Co., 272 U. S. 365, 386: ''Until recent years, urban life was
comparatively simple; but with the great increase and concentration
of population, problems have developed, and constantly are develop-
ing, which require, and will continue to require, additional restric-
tions in respect of the use and occupation of private lands in urban
communities. Regulations, the wisdom, necessity and validity of
which, as applied to existing conditions, are so apparent that they are
now uniformly sustained, a century ago, or even half a century ago,
probably would have been rejected as arbitrary and oppressive. Such
regulations are sustained, under the complex conditions of our day,
for reasons analogous to those which justify traffic regulations, which,
before the advent of automobiles and rapid transit street railways,
would have been condemned as fatally arbitrary and unreasonable.
And in this there is no inconsistency, for while the meaning of con-

stitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. . . . A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities.''

III. Lastly, the appellants urge that the judgment *nisi* should be reversed and the cause remanded for retrial because of the assigned error on the part of the trial chancellor in admitting the testimony (which was in the form of affidavits) of respondents' witnesses. The question of the admissibility of the affidavits in evidence was thus raised in the trial court: ''Plaintiffs' counsel: We were served with copies of those (affidavits), and we object to the affidavits being considered (in evidence); they do not controvert any of the allegations of the petition, and the matters and things set up in those affidavits are not germane to the issues as embraced in the petition. The court: There is an allegation in the petition that the ordinance is 'unreasonable, and therefore void.' I think, on the question of reasonableness, the affidavits, unless otherwise objectionable, will be admissible.''

The appellants cite no juristic authority in support of their contention and assignment of error, and we find none. The same contention was made in Cusack Co. v. City of Chicago, 267 Ill. 344, 349, speaking to which contention the Illinois Supreme Court said: ''When the reasonableness of an ordinance is under investigation as a question of fact, any pertinent matter which may reasonably be supposed to have influenced the enactment of the ordinance would seem to be proper evidence. If, as a matter of fact, the erection of bill-boards would increase the hazards of fire in residence districts, that fact, together with any other attending circumstance which would show that fires in residential districts would be more disastrous to life and property, and that their extinguishment would be attended with greater difficulties than in other districts, would have a direct bearing upon the reasonableness of the requirement . . . [Welch v. Swasey, 214 U. S. 91.]'' The assignment of error is not well grounded, and must be denied.

We conclude that the ordinance here in question is fairly referable to the police power of the respondent municipality, and therefore does not infringe the constitutional rights and guaranties, federal or state, invoked by the appellants, and that the ordinance is not unreasonable and arbitrary in its effect and application, either upon its face, or upon the evidence herein.

It follows that the judgment *nisi* should be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Frank*, *J.*, not sitting.