The *BORDEN COMPANY, Plaintiff-Respondent,*

v.

Don THOMASON, Commissioner of Agriculture, and Thomas F. Eagleton, Attorney General of Missouri, Defendants-Appellants,

and

Hal C. Blakeney and Thomas E. Blakeney, d/b/a Blakeney Dairy, Reiss Dairy Company, Inc., Woodlawn Farm Dairy Company, Inc., Ozark Dairy Company, Beverly Farm Dairy Company, Tucker Dairy Company, Hiland Dairy Company, Palace Bakery and Ice Cream Company, Intervenors-Appellants.

No. 48736.

Supreme Court of Missouri,

En Banc.

Jan. 8, 1962.

Rehearing Denied Feb. 12, 1962.

Joseph J. Kelly, Jr., Howard F. Sachs, Kansas City, Kyle D. Williams, Jefferson City, Joseph A. Greaves, Chicago, Ill., for plaintiff-respondent. Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel.

Thomas F. Eagleton, Atty. Gen., Wayne W. Waldo, Asst. Atty. Gen., for defendants-appellants.

Riddle, Baker & O'Herin, Veryl L. Riddle, Charles H. Baker, Edward F. O'Herin, Malden, Gray Dorsey, Chesterfield, for intervenors-appellants.

DALTON, Judge.

This is an action for a declaratory judgment and injunctive relief. The purpose of the action is to have House Bill No. 255, enacted by the 70th General Assembly and styled "An Act relating to sales of milk and milk products," declared unconstitutional, void and ineffective in its entirety and to have the defendants enjoined from enforcing or attempting to enforce the provisions of said Act. Certain interested parties were permitted to intervene. The Act is now designated as Secs. 416.410 to 416.560, inclusive, RSMo 1959 and is referred to as the "Unfair Milk Sales Practices Act." (All statutory references are to RSMo and V.A.M.S. unless otherwise indicated.) The trial court found the issues for the plaintiff and granted the relief prayed. Defendants and intervenors have appealed.

The evidence shows that respondent is a corporation organized and existing under the laws of the State of New Jersey and duly authorized to transact business in the State of Missouri. It is actively engaged in many parts of the United States in the business of manufacturing, processing, selling and dealing in dairy products of many kinds. In the State of Missouri it is and has for many years been engaged in the processing and selling (at wholesale and retail) of milk products, including market milk, pasteurized milk, vitamin D milk, homogenized milk, flavored milk or flavored milk drinks, sweet milk, whipping cream, homogenized cream, skimmed milk, buttermilk, cultured buttermilk and cottage cheese. In addition, it processes and sells (at wholesale and retail) ice cream, frozen desserts, and numerous non-dairy products. A substantial amount of such products thus processed and distributed by it are processed or made from milk and cream produced on Missouri farms. Approximately 85% of plaintiff's business is wholesale and 15% retail. It buys milk from Missouri, Kansas and Iowa farmers. It fixes wholesale prices on delivery routes, retail prices for home delivery, and dock prices to distributors who come for their products. Respondent's milk purchases annually total between two and one-half and three million dollars.

The Act in question here contains thirty-one sections and certain subsections. It is a comprehensive Act relating to the sale of milk and milk products. For our purposes at this time it will be unnecessary to set out the Act in full, but we shall briefly refer to certain of its provisions.

Sec. 1 of the Act (now § 416.410) defines certain terms used in the Act.

Sec. 2 (now § 416.415) deals with sales by processors or distributors of any milk product for less than cost and makes the advertising, offer to sell or sale by such persons for less than cost under certain circumstances *prima facie* evidence of a violation of said section.

Sec. 3 (now § 416.420) deals with discrimination in price by processors or distributors of such products in different sections of the state and provides that proof of a differential in price in various parts of the state, under certain circumstances except as therein stated, is *prima facie* evidence of a violation of this section.

Sec. 4 (now § 416.425) deals with non-processing retailers and prohibits the sale of any milk product by such retailers under certain circumstances for less than cost to the retailer and makes the sale or offer of sale of such products by such retailer *prima facie* evidence of a violation of this section.

Sec. 5 (now § 416.430) deals with bulk milk handlers and prohibits the sale of dairy-milk products under certain circumstances for less than cost to them and provides that the sale of such bulk milk by the handler at less than cost shall be *prima facie* evidence of a violation of this section.

Sec. 6 (now § 416.435) prohibits under certain circumstances any person from combining any milk product with other commodity or service at a price less than the aggregate of the cost of the milk product and the other commodity or service offered for sale, and makes such a sale *prima facie* evidence of a violation of this section.

Sec. 7 (now § 416.440) prohibits milk processors and distributors from offering under certain circumstances their purchasers rebates, discounts, etc., and makes proof of such conduct *prima facie* evidence of a violation of this section and likewise prohibits a milk-product purchaser from accepting such rebate, discounts, etc., and makes proof of the acceptance of anything of value by such milk-product purchaser *prima facie* evidence of a violation of this section.

The mentioned circumstances referred to in the several sections are "with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly."

The Act imposes a duty on the attorney general or prosecuting attorney to examine complaints of persons claiming to be injured by violations of the Act. Provision is made for the issuance of writs of injunction against such violations. Provision is also made for the issuance of licenses to those subject to the Act and for the fixing of license fees. The Commissioner of Agriculture is designated as a commissioner and authority is given for the promulgation of rules and regulations to carry out the purposes of the Act. Provision is further made for the recovery of triple damages by those injured by violations of the Act. It is further provided that the remedies provided for by the Act are exclusive and that no criminal fines or penalties shall be imposed for violation of its provisions.

In its petition the plaintiff challenged the Act in thirteen particulars and the trial court sustained plaintiff's objections on nine separate grounds summarized in three conclusions of law. Plaintiff concedes that many of the alleged defects in the Act are essentially legal questions and that most of the evidence offered was directed to one of the grounds assigned for the invalidity of one section of the Act. This evidence will be reviewed in connection with the consideration of plaintiff's attack on Sec. 2 of the Act which prohibits the sale of milk below cost.

■ Appellants first contend that the court erred in giving judgment for plaintiff for the reason that plaintiff's petition fails to state a claim upon which relief can be granted and that the evidence presented is insufficient to support the judgment rendered by the court. Appellants insist that the evidence indicates plaintiff is not violating any provision of the Act, but that it does show plaintiff would like to make combination sales, grant advertising allowance, furnish certain free services, make certain donations, give away certain merchandise, give or loan certain equipment and give financial aid under certain circumstances, all in carrying on its business as it desires and as it had been doing prior to the effective date of the Act and would do now if it were not prohibited by the Act. Appellants argue that plaintiff cannot point to one single right that has been curtailed or infringed, and insists that "there is no controversy presently existing between the plaintiff and the defendants." We find no merit in these contentions.

Plaintiff's petition alleged that: "The provisions of the Act directly and indirectly interfere with the proper and economical conduct of plaintiff's business, the preservation and expansion of its markets, the proper handling and sale of its products to the consumer, and deprive plaintiff of its property without due process of law, in violation of the Constitution of the State of Missouri, and the Constitution of the United States * * *."

■ Under the Declaratory Judgment Act, Secs. 527.010–527.140, a "justiciable controversy" exists where an actual controversy exists between persons whose interests are adverse in fact. Plaintiff must have a legally protectible interest at stake and the question presented must be appropriate and ready for decision. State ex rel. Chilcutt v. Thatch, 359 Mo. 122, 221 S.W.2d 172, 176. We think the pleadings and evidence clearly show facts bringing this cause within the express provision of the Declaratory Judgment Act. The record is sufficient to show a controversy ripe for decision. The fact that plaintiff has not actually violated the provisions of House Bill No. 255 in question here does not make the action premature. We must and do hold that plaintiff can properly have the validity of the Act determined in this declaratory judgment action before proceeding in defiance of it. Plaintiff invoked a proper remedy. City of Joplin v. Jasper County, 349 Mo. 441, 161 S.W.2d 411, 412; City of Nevada v. Welty, 356 Mo. 734, 203 S.W.2d 459, 460; Tietjens v. City of St. Louis, 359 Mo. 439, 222 S.W.2d 70, 71.

Appellants next contend that the trial court erred in declaring the Act in question unconstitutional and void in its entirety. In ruling this issue we shall for convenience consider respondent's several contentions with reference to the unconstitutionality of specific sections of the Act and as a whole. Respondent says that the issues in this case include the following: (1) whether there is a proper governmental interest in limiting competition in the milk industry; (2) whether such a limitation of competition is a function of the State government in light of the Federal anti-trust laws; (3) whether this law constitutes discriminatory class legislation; and (4) whether it contains an unlawful delegation of legislative power. Respondent also says that there are grave questions concerning the propriety of the means chosen by the General Assembly to limit competition in the milk industry.

As to whether there is a proper governmental interest in limiting competition in the milk industry by a specific statute applicable to it, the defendants' evidence tends to show that, pursuant to Senate Concurrent Resolution No. 19 of the 69th General Assembly, an interim committee was appointed to study the problem of production, processing, sale and distribution of milk in this State. The chairman of this committee was Senator Albert M. Spradling, Jr., of Cape Girardeau. The committee made its report in January 1959 to the 70th General Assembly and submitted to it a detailed report entitled "Final Report of the Joint Committee on Milk Producers and Distributors." A proposed bill was adopted by the committee to be introduced for the consideration of the General Assembly.

This report points out that: "There is no article of food in more general use than milk; none whose impurity and unwholesomeness may more quickly, more widely, and more seriously affect the health of those who use it. The regulation of its sale is an imperative duty that has been universally recognized. * * * Between 1933 and 1936 twenty-seven states adopted milk price control legislation." The committee, however, submitted a milk sales regulation bill patterned after the Tennessee Act. "Dairy Law of the State of Tennessee," Chapter 3, Secs. 52.331 to 52.341. The committee's finding as to the situation existing in Missouri was as follows:

"Testimony received by the committee revealed the seriousness of a situation which has been only too evident in the corner grocery stores and supermarkets of our state

during the past months. A series of destructive price wars has frightened and demoralized those of our citizens who fully understand the implications of such activities as well as those who depend for their livelihood upon the milk industry. Milk has sold for as little as eight cents per half gallon in some areas. In one town, the price of milk and other dairy products dropped so low that the farmers were able to purchase them to feed to their pigs.

"Of course, prices such as these are often greeted with enthusiasm by inflation-weary consumers, but the natural consequences thereof bode future difficulties for producers, distributors and consumers alike. Price wars exert tremendous pressure on smaller distributors who are without the resources to operate for extended periods of time when a loss is incurred on each sale. The price of much of the milk purchased from producers in Missouri is established under a federal order. Thus the distributor finds himself trapped between the contracting pincers of the stable price of the milk he buys and the ever lower price of the milk he sells. Under such conditions small distributors disappear and large distributors expand until competition no longer controls prices and the buyer is left to the mercy of the seller. Where prices paid to producers are not fixed, the losses of the producer may be partially shifted to the farmer. This, together with other factors, induces the dairyman to abandon milk production and could lead to a serious short supply in years to come."

The issue to which this evidence applies is presented by respondent's contention that the Act is "invalid as special and discriminatory legislation, in that it prohibits sales below 'cost' of milk products but fails to prohibit such sales of similar products, prohibits certain price discrimination by milk sellers but not other sellers, and prohibits certain pricing and business practices in the distribution of dairy products but not in the distribution of similar products." The trial court found that the Act was not applicable uniformly or equitably to all members of an appropriate class, but operated in a discriminatory fashion in that the pricing and marketing legislation was limited to the milk industry; that the Act constituted "special legislation, enacted in violation of the right to equality of treatment and freedom from arbitrary discrimination, and in violation of the principle that no special legislation shall be enacted when a general law can be made applicable, as provided by Article I, Section 2 and Article III, Section 40 [30] of the Missouri Constitution and by Section 1 of the Fourteenth Amendment to the United States Constitution."

Respondent seeks to support the trial court's judgment by argument to the effect that the legislation under consideration fails to have uniform applicability to all members of an appropriate class; that it operates in arbitrary and discriminatory fashion; and that there is no reason to forbid sales below cost of milk products, or to prohibit other competitive prices in the milk industry, which are not equally applicable to baker and meat packers, or sellers of gasoline and cigarettes. Respondent insists that the peculiarities of the products sold by milk sellers and processors do not naturally suggest a separation from the products and commodities sold by other producers and dealers. Respondent argues that a general law governing the pricing and marketing of all commodities can be made applicable. Plaintiff cites McKaig v. Kansas City, 363 Mo. 1033, 256 S.W.2d 815; Hagerman v. City of St. Louis, 365 Mo. 403, 283 S.W. 2d 623; Woolley v. Mears, 226 Mo. 41, 125 S.W. 1112, and other cases. Respondent also cites Sec. 40 [30] of Article III of the Missouri Constitution 1945, V.A.M.S., and refers to the equal protection section of the Fourteenth Amendment and to Secs. 2 and 10, Article I of the Missouri Constitution 1945. Respondent concedes the right of the State to regulate and control the production and distribution of milk with regard to sanitation and purity but not as to sales and distribution and sales practices. Respondent insists that the General Assembly cannot take a natural class of persons, split

that class in two, and then arbitrarily designate the dissevered fractions of the original unit as two classes, and thereupon enact different rules for the government of each. Woolley v. Mears, supra.

In the McKaig case, supra, this Court held that an ordinance prohibiting automobile sales on Sunday was invalid as special legislation because it was limited to automobile dealers, while permitting Sunday sales of "all commodities and all merchandise except automobiles."

■ In considering the validity of the Act in question here we must keep in mind that, "An act of the Legislature carries the presumption of constitutionality. The court will not declare an act unconstitutional unless it plainly contravenes the Constitution." State ex rel. Fire Dist. of Lemay v. Smith, 353 Mo. 807, 184 S.W.2d 593, 594. "While it is the duty of the courts to guard the constitutional rights of the citizen against merely arbitrary power, it is equally true that legislative enactments should be recognized and enforced by the court, as embodying the will of the people unless they are plainly and palpably a violation of the fundamental law of the Constitution." Blind v. Brockman, 321 Mo. 58, 12 S.W.2d 742, 747[5]; Barker v. St. Louis County, 340 Mo. 986, 104 S.W.2d 371, 377; Bowman v. Kansas City, 361 Mo. 14, 233 S.W.2d 26, 33[12]; City of St. Joseph v. Hankinson, Mo.Sup., 312 S.W.2d 4, 10[9–12].

In Poole & Creber Market Co. v. Breshears, 343 Mo. 1133, 125 S.W.2d 23, 32[16–17], the Court said:

"That the legislature may make reasonable classification among the various subjects of legislation must be conceded, and since the presumptions are all in favor of the validity of its acts ' "It must be made to appear beyond a reasonable doubt that 'there are no distinctive circumstances' " justifying the classification.' Thomas v. Buchanan County, 330 Mo. 627, 51 S.W.2d 95, 98. * * * Milk is almost universally used as a food and upon it the health of

the people largely depends. It has often been particularly the subject of regulatory legislation. In City of St. Louis v. Liessing, * * * (190 Mo. 464, 89 S.W. 611) in upholding the validity of an ordinance of St. Louis prohibiting the sale of milk containing less than a certain amount of milk fats, the court said, 190 Mo. loc. cit. 481, 89 S.W. loc. cit. 613, 'Perhaps on no one subject has this police power been affirmed as often as the right to inspect and regulate the sale of milk and cream.' Appellant's contention that the law in question violates the constitutional inhibition against special laws cannot be sustained."

In the case of Borden Co. v. McDowell, 8 Wis.2d 246, 99 N.W.2d 146, 155, the court pointed out "that the dairy industry is subject to regulation and has been regulated so by the legislature for the public welfare for many years." In the case of State of Kansas ex rel. Anderson v. Fleming Co., 184 Kan. 674, 339 P.2d 12, the court said the dairy industry had been regulated for the purpose of protecting the public health and welfare more completely than any other industry.

In the case of H. P. Hood & Sons v. DuMond, 336 U.S. 525, 69 S.Ct. 657, 660, 93 L.Ed. 865, the court said: "Production and distribution of milk are so intimately related to public health and welfare that the need for regulation to protect those interests has long been recognized and is, from a constitutional standpoint, hardly controversial. Also, the economy of the industry is so eccentric that economic controls have been found at once necessary and difficult." The police power extends to economic needs. And see McElhone v. Geror, 207 Minn. 580, 292 N.W. 414.

■ We find no merit in respondent's contention that the Act in question relating to the sale of milk and milk products is special discriminatory legislation in violation of Article I, Secs. 2 or 10, or Article III, Sec. 40[30] of the Missouri Constitution 1945, or of Sec. 1 of the Fourteenth Amend-

ment to the Constitution of the United States. Clearly there is a greater governmental interest in promoting and insuring fair competition in the milk industry by prohibiting sales below cost in that industry than in other industries, which fact accounts for the legislative attempt to remedy unfair competition and avoid the danger of monopoly in that industry. On the facts found by the interim committee the Legislature could properly single out the milk industry for a valid exercise of the police power of the State to remedy conditions found to exist in that industry.

Before proceeding further with respondent's contentions regarding the validity of the Act, we should say that it is apparent on the face of the Act that in passing it the Legislature was purporting to act under the police power of the State and that the Act is designed to prevent monopolies and unfair trade practices by competitors for the public good. "The propriety, wisdom, and expediency of legislation enacted in pursuance of the police power is exclusively a matter for the Legislature." Star Square Auto Supply Co. v. Gerk, 325 Mo. 968, 997, 30 S.W.2d 447, 462[14–16]. "From its very nature the police power is a power to be exercised within wide limits of legislative discretion and if a statute appears to be within the apparent scope of this power the courts will not inquire into its wisdom and policy, or undertake to substitute their discretion for that of the legislature." Poole & Creber Market Co. v. Breshears, supra, 125 S.W.2d 23, 27[1–5]. "The exercise of its police power by the state or the city can only be declared improper or invalid when rules and regulations imposed thereunder can be said to be unreasonable." State ex rel. Vogt v. Reynolds, 295 Mo. 375, 393, 244 S.W. 929, 934. Further, the burden to show the unreasonableness of a statute or regulation under the police power is upon the one asserting its invalidity. Passler v. Johnson, Mo.Sup., 304 S.W.2d 903, 908[3–7]. Private rights under the Constitution are subject to the valid exercise of the police power by the State for the public good. City of St. Louis v. Kellmann, 295 Mo. 71, 82, 243 S.W. 134.

In the case of ABC Liquidators, Inc. v. Kansas City, Mo.Sup., 322 S.W.2d 876, 881[4], the Court said: "It is apparent that the ordinance in question purports to be an exercise of the police power, which power has been conferred upon the city of Kansas City by statute. Section 82.300 RSMo 1949, V.A.M.S.; Turner v. Kansas City, 354 Mo. 857, 191 S.W.2d 612, 617[8–10]. A proper exercise of the police power is essential to the continuance of community life in a densely populated urban center and to its public safety, health, morals, convenience, welfare, interest and general prosperity, which vary with the specific locality and the changing requirements of life from time to time. Turner v. Kansas City, supra. 'The limit of the exercise of the police power is necessarily flexible, because it has to be considered in the light of the times and the prevailing conditions.' State v. Gordon, supra, [143 Conn. 698] 125 A.2d 477, 480. 'Upon it (police power) depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property.' Bellerive Inv. Co. v. Kansas City, 321 Mo. 969, 13 S.W.2d 628, 635.

"In the last mentioned case, where the plaintiffs-appellants therein were attacking a city ordinance and had appealed from an adverse judgment, this court said: 'It has been definitely and clearly established and settled, by the decisions of this court and of the federal Supreme Court, that a statute or a municipal ordinance, which is fairly referable to the police power of the state or municipality, and which discloses upon its face, or which may be shown aliunde, to have been enacted for the protection, and in furtherance, of the peace, comfort, safety, health, morality, and general welfare of the inhabitants of the state or municipality * * * cannot be held invalid as wrongfully depriving the appellants of any right or privilege guaranteed by the

Constitution, state or federal; the reason and basis underlying such decisions being that the personal and property rights of the individual are subservient and subordinate to the general welfare of society, and of the community at large, and that a statute or ordinance which is fairly referable to the police power has for its object the "greatest good of the greatest number." ' Bellerive Inv. Co. v. Kansas City, supra, 13 S.W.2d 628, 634[1]; Turner v. Kansas City, supra, 191 S.W.2d 612; State ex rel. Rouveyrol v. Donnelly, 365 Mo. 686, 285 S.W.2d 669, 674[1–4]."

The court in the case of Mississippi Milk Commission v. Vance, 240 Miss. 814, 129 So.2d 642, 652, 660, after reviewing at some length many cases and milk control acts from throughout the entire country, arrived at the following conclusions: "All of the milk control acts, which have been referred to in the foregoing pages, were either patterned after, or contained the essentials of, the Milk Control Act of New York, which was passed upon by the Supreme Court of New York and the Supreme Court of the United States in the appeals of Nebbia v. People of State of New York, * * * [291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940].

"[1] The rationale of all of the decisions, upholding the constitutionality of the milk control acts, is that the milk industry is affected with a public interest and that the several legislatures, in enacting such laws, were exercising the police powers of the state. These cases clearly announce, and in fact there is no authority to the contrary, that the state exercises the highest governmental authority when it invokes its police powers. In other words, the police power takes precedence over all private rights even though they stem from constitutional bases." And see Schwegmann Bros. Giant Super Markets v. McCrory, 237 La. 768, 112 So.2d 606; May's Drug Stores v. State Tax Commission, 242 Iowa 319, 45 N.W.2d 245; Jersey Maid Milk Products Co. v. Brock, 13 Cal.2d 620, 91 P.2d 577, 587. And see annotations on

"Validity, construction and application of statutory provision prohibiting sale of commodities below cost," 128 A.L.R. 1126 and 118 A.L.R. 506.

In the New York milk control case, Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, 1483, the United States Supreme Court said: "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. * * * Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

Respondent relies upon the case of Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692,

where the court held that the milk industry was not "affected with a public interest" and that the General Assembly was not authorized to pass an act fixing the price of milk without violating the due process clause of the state constitution. The opinion pointed out that that court was not bound in construing the state constitution by the rulings of the United States Supreme Court which had twice held the right of a state to authorize the fixing of milk prices as against the contention that an act violated the due process clause of the Constitution of the United States. The court followed the reasoning of a dissenting opinion in the case of Nebbia v. People of State of New York, supra. The Georgia court said: "While we recognize that the General Assembly was authorized to find that the milk industry was large, milk was a product of virtually universal use throughout the State, that it was perishable, important as a human food, and affected the health of the people, and to further find that it was important to keep an adequate and constant supply at a price fair to both producer and consumer; yet such facts would not qualify the milk industry as being a business 'affected with a public interest,' notwithstanding the public or the General Assembly would have a feeling of concern in regard to its maintenance." (67 S.E.2d 692, 694.)

Respondent also relies upon Gwynette v. Myers, 237 S.C. 17, 115 S.E.2d 673, 676[3], where the Court held that the business of selling milk was not affected with the public interest and that regulation of milk prices was beyond the State's police power. The court further said that, "Involved here is no question of public health, safety or morals" and that the only issue concerned the asserted right of the State to fix the minimum price of milk at retail. In holding that the milk industry was not affected with the public interest the Court clearly adopted a minority viewpoint. However, the opinion does concede that a state has power to regulate and control the prices that one in private business may charge for goods or services where such business is "affected

with a public interest." The opinion further concedes the term "affected with a public interest" is not susceptible of precise definition.

■ We must and do hold that the Act was within and referable to the police power of the State and the only further questions concern the reasonableness of the regulations adopted and their relationship to the objects sought to be obtained.

Respondent's second main contention is that the "Prohibition of sale of milk products below 'cost' of such products is invalid because it is vague, indefinite and impractical of application, in that cost accounting necessarily occurs after sales are made, the frequency with which cost must be determined is not prescribed, whether average costs may be used is not prescribed, and the method of allocating joint, common and indirect costs of raw materials, processing and delivery is not prescribed."

■ Respondent contends that the Act is a penal statute "invalid under the Due Process Clauses of the Fourteenth Amendment and the Missouri Constitution (Sec. 10, Art. I)." Respondent's theory that the Act is penal in nature is based upon the provisions for recovery of treble damages and ouster from the State for violations. See Secs. 10, 17 and 20 of the Act, now Secs. 416.455, 416.490 and 416.505. Respondent's argument is directed particularly at Sec. 2 of the Act, now Sec. 416.415. This section is as follows:

"Section 2.

"1. No processor or distributor shall, with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, advertise, offer to sell or sell within the state of Missouri, at wholesale or retail, any milk product for less than cost to the processor or distributor.

"2. Proof of the advertising, offer to sell or sale of milk products by a processor or

distributor for less than cost to the processor or distributor is *prima facie* evidence of a violation of this section.

"3. A profit from the sale of products other than milk products is not used in cost computation to subsidize or lower the cost of doing business with respect to milk products."

Subsection 5 of Section 1 (now § 416.-410[5]) provides:

"(5) 'Cost to the processor or distributor', the price paid for raw materials, plus the cost of doing business, which shall include labor, salaries paid executives and officers, rent, interest, depreciation, power, supplies, maintenance of equipment, selling costs, advertising, transportation and delivery costs, credit losses, all types of permits and license fees, all taxes, insurance, and all overhead expenses of the processor or distributor."

Not all sales or offers to sell "below cost" are prohibited by the Act, since Section 8 (now § 416.445) provides certain exemptions. We need not consider these exemptions at this time.

Respondent properly points out that the several statutory prohibitions against the sale of milk and milk products "below cost" are essential to the fulfillment of the purposes of the Act; that such prohibitions are the primary aim of the Act; and that whether these prohibitions can be given a meaningful and fair application was the central issue litigated below. The only evidence heard by the court was on this issue and respondent relies upon that evidence.

On the issue of vagueness, indefiniteness and impracticability of application of Sec. 2, plaintiff-respondent offered as a witness the Manager of the Kansas City Branch of The Borden Milk Company. His testimony tended to show that it is impossible for him to accurately determine the cost of one specific item on any day or week; that his Company used the average cost accounting; that under plaintiff's method of accounting expenses are totalled monthly, all products sold are assigned "points" and the points are totalled, and then an average cost per point is determined. A quart of milk is assigned one point, a carton of cottage cheese is likewise assigned one point and a half-pint of cream is assigned one point; that, under this method of accounting, the cost allocated to a quart of chocolate milk is the same as that assigned to a quart of homogenized milk, although chocolate milk actually costs more than homogenized milk because sugar and chocolate are added; that this system of accounting does not accurately show the exact relationship of the selling price to the actual cost of the various products; that the Company generally had some idea but not "a real accurate knowledge of the actual cost" of the product sold; that the Company is working with averages and the cost accounting in a milk operation is so complicated it is almost impossible to separate the various items; that in his opinion the average cost per point as determined by the Company's present bookkeeping methods has relationship to the actual cost of the processing of the various products; that although it has some relationship the Company didn't have "a real accurate knowledge of the actual cost"; that in respondent's plant they have one boiler room and one engine room and the steam from the milk operation and the ice cream operation come from this same boiler; that the Company cannot accurately determine the amount of fuel or steam required for each department, let alone the actual amount that goes into the individual product itself; that the same is true for refrigeration since it is impossible to accurately distribute the refrigeration cost between milk and ice cream or chocolate milk and cottage cheese; that under plaintiff's method of accounting there is no segregation between the cost of merchandise delivered at wholesale and the cost of merchandise delivered by home delivery drivers; that there is no separation in delivery cost between the various products and it is impossible to tie down delivery costs to an individual specific item; that

he didn't know what the Company's costs were on a particular route because he just threw wholesale and retail routes together and came up with a general distribution of cost; that the price plaintiff pays to farmers for raw milk is set by the Federal Government, (Federal Market Administrator's Order No. 13), f. o. b. plaintiff's dock; that when raw milk is purchased from handlers, there are additional handling or transportation costs; that while the price set by the Government is uniform each month the price may vary from month to month and the price announcement is made five or six days after the effective date, and may be delayed as much as ten to twelve days; that during such period plaintiff does not have any idea of the cost of raw milk which it is buying; that a receiving vat may have raw milk which was acquired at different cost prices, where it contains producers' milk and handlers' milk; that the price also varies as to milk delivered in ten-gallon cans and bulk tank milk, since a premium is paid on bulk deliveries; that the largest item produced by plaintiff is homogenized milk, but it also produces as by-products, coffee cream, whipping cream, half-and-half, skimmed milk, chocolate milk, buttermilk and cottage cheese; that plaintiff also produces cream-line milk, which is not homogenized; that in order to standardize the butter content of the product, cream or skimmed milk is often added to the raw milk; that cream and skimmed milk are produced by the use of a separator and skimmed milk is also used to standardize homogenized milk, or it is sold as skimmed milk or made into cottage cheese; that some skimmed milk is used in making buttermilk; that different types of pasteurizers are used for homogenized milk and skimmed milk than that used for buttermilk, cream or chocolate milk; that homogenizers are used for homogenized milk, for sour milk, and for the creamy mixture used for cottage cheese; that milk products may be packaged by different types of machines and in different types of containers; that while the Company could not

determine whether it was selling any particular item on any particular day below the cost of the item, it can tell on the average on all items whether there is a profit or loss; that he has some knowledge of the general matter as to whether milk is being sold at a profit, but he could not tell whether the Company was making money on a twelve-ounce carton of cottage cheese or losing money on a quart of buttermilk; that plaintiff has never tried to introduce a system of cost accounting which would give that information; that he can estimate raw milk costs early in the month, before the market price order is announced, within a half-cent a quart, but the average profit for the entire industry is less than half a cent a quart; that he could not tell whether the Company was losing money on a particular quart of milk, but admitted that he knew what the average cost was per point, although he could not fix the exact cost of a quart of homogenized milk.

Plaintiff offered as a witness on cost accounting one Herbert F. Taggart, Professor of Accounting at the University of Michigan. He qualified as an expert in cost accounting and stated that very few businesses have accounting systems which permit determination of the cost of each product; that the list of items of cost that are required to be taken into account under the Act in question here does not give any information about how the different items are to be treated or how these costs are to be allocated among products, which is an extremely difficult problem; that the Act does not say how often costs are to be ascertained or how much leeway there is to be given for estimates and judgments of the cost accountant and manager involved; that the ascertainment of costs in the dairy industry present problems of extreme complexity because the degree of joint costs is extremely great; that the dairy industry, the meat-packing industry, oil refining and lumbering are excellent examples of joint product industries where joint costs are particularly acute; that there is literally no method by which it is possible to determine

the material cost in joint products; that there is a recognized method of cost accounting where the selling price is used to compute costs, where costs are calculated backwards from the selling price; that all products are delivered by the same trucks and drivers and any effort to allocate such costs to particular products would be very arbitrary and not worth doing from a management standpoint; that plaintiff's "point method" is not too bad for some purposes, although the Company realizes that this method does not yield an exact and accurate cost per unit for any particular product; that it does show cost trends and tests management methods; that because of the fluctuations in cost and in demands for various products, different cost results would be obtained if they were computed monthly, semi-annually or annually; that because of joint costs in storage and delivery, the cost of a half-pint of milk to a dairy customer on a particular day simply could not be ascertained; that the allocation of delivery costs is complicated by the fact that there are savings on large-volume deliveries, so that the cost might vary according to the customer; that the language of the Act in question does not furnish sufficient instruction for him to know how to do the accounting and determine whether or not the processor is selling a particular product below cost at a particular time; that plaintiff's system of cost accounting does not ascertain production cost in the degree of precision that would be necessary under the Act; that plaintiff's system does not produce a reasonable approximation of costs for individual products and to ascertain such costs would require plaintiff to change its system.

Defendants offered the testimony of Florian V. Solzen, an accounting consultant working for milk and ice-cream dealers in setting up accounting systems for financial and cost accounting. This witness testified that one has to use the average prices because one cannot know whether a particular amount of the base product went into certain other products; that the proper method of allocating cost is by the use of "factors", by the use of which there can be "a fairly accurate distribution of the different cost factor to the product"; that such cost accounting should be done every month or at least each quarter; that his system will yield the cost of the finished product; and that the average cost of the different milk products can be determined. He was not familiar with a particular author's book which stated that: "Cost accounting is not an exact science, nor does it produce accurate results according to the standards of statistical analysis. The existence of joint costs, in both the production and the selling divisions of business enterprises, makes it impossible to compute accurate costs for departments, services, or units of production. Most departments or operations produce two or more products with the same labor, equipment and supervisory force, while neither factory overhead nor selling overhead costs can be identified specifically with particular activities or products." The witness further said that there are alternative methods of cost accounting and that under the system of accounting which he uses the product cost is determined after the product has already been sold; that there are different methods of depreciation, all of which are recognized as correct and proper, but each method produces a slightly different result, but that under his system the determination of the cost of a particular product in advance is a good approximation of the particular cost of the particular product.

Respondent relies particularly upon the case of State of Kansas ex rel. Anderson v. Fleming Co., supra. The Act there considered is referred to as "an unfair trade practices act" dealing only with dairy products and the sale thereof. The Act was attacked upon the ground, "First, that no criminal intent is required under the statute, but that the sale of any dairy products for less than cost to the wholesaler, processor or distributor is made to constitute a criminal act. Second, that no definition of 'cost * * * at the point of delivery' is contained in the act." The Act was also said to be indefinite

"as to exceptions as to liability" in that it only permitted sales below cost "made in good faith to meet existing *lawful* competition." The opinion points out that the Act made *no attempt to define cost* and that it was *totally silent* as to "what expenses are to be included in arriving at the cost at the point of delivery." The Court further said: "It must be evident that a criminal statute, which neither requires a criminal intent in doing the proscribed act or defines with exactness the act forbidden, and further is indefinite as to exceptions as to liability, must be considered to deny due process to one against whom the statute is asserted." The district court had held the Act unconstitutional in its entirety, apparently upon the theory that the Legislature would patently not have enacted the statute without the particular sections attacked and that, therefore, the entire statute was unconstitutional. The Supreme Court held that this judgment was too broad and the order was set aside except as to the two specific subsections of the Act which were attacked. The Court said: "The district court did not err in finding subsections (*l*) and (m) of section 50–503 denied due process to the appellees." And see State of Kansas v. Consumers Warehouse Market, 183 Kan. 502, 329 P.2d 638. These cases do not aid respondent, since the Missouri Act is not subject to the defects mentioned. The Act in question here is not a criminal statute and criminal penalties may not be imposed for violations of the provisions of the Act and the items to be considered in determining costs are set out.

Respondent further insists that considerable deference should be given to the trial court's findings based on the testimony hereinbefore set out, since the trial judge had a better opportunity to judge the merits of the witnesses and the fair meaning of their testimony. Respondent construes the evidence as showing there are no methods under which a milk processor can ascertain the cost of each of its products and hence there are no means for accurately determining compliance with the statute. Respondent also insists that the "allocation of delivery costs to particular products is an inherently insoluble problem." Respondent says that where raw material is used to produce several products, as in dairy processing, the allocation of the raw material costs and the processing and delivery costs among the several products is purely arbitrary and cannot be "accurately allocated to particular products." Respondent and its witnesses assume that the statute requires *absolute exactness* in the determination of cost by some approved system which will determine the exact cost of a particular quart of milk delivered on a particular day to a particular customer and that such exact cost must always be ascertainable by some particular method. We think the statute must be given a more practical and reasonable construction and that the statutory definition of the term "cost to processor distributor" shows upon its face that average costs are intended. We quite agree that the cost of doing business, as mentioned in the statute, including labor costs, salaries paid executives and officers, rent, interest, depreciation, power supplies, maintenance of equipment, selling costs, advertising, transportation and delivery cost, credit losses and all types of permits and license fees, all taxes, insurance and overhead expenses of the processor or distributor as mentioned in Sec. 1[5] (§ 416.410[5]) cannot be definitely and exactly determined upon a day, hour or minute basis, or with reference to a particular quart of milk delivered on a particular date. The statute makes no such requirement. Practically all of the items mentioned in Sec. 416.410[5] accrue or are paid or the losses are sustained over some reasonable period of time. Some lapse of time is necessary to determine them. Clearly average costs may be used in the determining of the cost of any product controlled by the statute. In fact plaintiff's own evidence shows that plaintiff can and does allocate delivery costs and does ascertain all other costs on an average basis to within one-half cent on a quart of milk. Its evidence shows that it can and does fix

prices even before the monthly government price for raw milk is announced. Plaintiff's evidence further shows that the average profit for the entire milk industry on the sale of a quart of milk is less than half a cent. This testimony indicates that the industry does allocate joint costs on some basis. It therefore appears that what the respondent complains of is the failure of the Act to provide rules for determining cost with exactness and to within less than the one-half cent per quart range.

■ The Act (now § 416.460) provides that the Commissioner is authorized and directed to promulgate rules and regulations to carry out the purposes of Secs. 416.410 to 416.560. Under this authority the Commissioner may promulgate rules and regulations as to how the various items of costs are to be treated and how costs may be allocated among the several products, how often costs are to be ascertained and what leeway, if any, is given for the estimate and judgment of the business manager or those in charge of the company. The Act clearly sets up a standard for the determination of cost and fixes the particular items which may be taken into consideration. The Legislature need not go into all of the details of fixing a particular method of allocating costs among various products but it has set up a standard that will meet the test applied in such a case. All of the matters complained of may be taken care of by reasonable rules and regulations which the Commissioner has authority to promulgate. "The authority to make rules and regulations to carry out an express legislative purpose or to effect the operation and enforcement of a law is not an exclusively legislative power, but is rather administrative in its nature. * * * The policy of the law favors the placing of detailed responsibility in administrative officers. * * * A distinction is drawn between the more important subjects which must be entirely regulated by the legislature itself and those of less interest as to which general provisions may be made and power given to administrative officers to carry out the details under such

general provisions." 11 Am.Jur., p. 955, Constitutional Law, Sec. 240. And see Jersey Maid Milk Products Co. v. Brock, supra; Schwegmann Bros. Giant Super Markets v. McCrory, supra. Failure of the Legislature to provide a more detailed method of ascertaining cost does not establish the invalidity of the Act, where a standard has been set up by the Legislature, and the Commissioner is authorized to determine and fix reasonable rules for carrying out the purposes of the Act.

In Borden Co. v. McDowell, supra, 99 N.W.2d 146, 156[12], the Court said:

"Respondents find uncertainties in the application of the law. We do not find that there are necessarily the alleged uncertainties. That may or may not appear when attempts are made in enforcement. In the meantime we should wait until there are concrete facts rising from the application of the statute. If unconstitutional applications are attempted, the courts must deal with them at that time.

" 'In the construction of statutes it is generally held that they should not be held to be too indefinite to be operative because they contain terms not susceptible of exact meaning, or are imperfect in their details, or where they employ words commonly understood. [Sic.] 50 Am.Jur., Statutes, [p.] 489, [sec. 473]. A statute should not be pronounced void for uncertainty if it is susceptible of any reasonable construction. Wentworth v. Racine County, 1898, 99 Wis. 26, 74 N.W. 551. No reason appears why these rules should not be applied to orders of an administrative agency. They should be given effect if by any reasonable rule of construction they are capable of administration and enforcement.' Madison Bus Co. v. Public Service Comm., 1953, 264 Wis. 12, 14, 58 N.W.2d 463, 464."

Under the decisions of some courts, Sec. 416.415 in its present form would apparently be sufficient without the necessity of a commissioner providing rules and regulations for carrying the Act into effect.

In May's Drug Stores v. State Tax Comm., supra, 45 N.W.2d 245, 256, the Court said:

"A cost of doing business formula, much like the one present in our act, in the Wyoming statute prohibiting sales below cost was upheld in State v. Langley, 53 Wyo. 332, 84 P.2d 767. The following language from that opinion which meets with our approval has often been quoted to sustain the constitutionality of similar provisions in statutes prohibiting sales below cost. See Associated Merchants of Montana v. Ormesher, 107 Mont. 530, 86 P.2d 1031; Dikeou v. Food Distributors Ass'n, 107 Colo. 38, 108 P.2d 529, 533: 'Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by "cost," what business men generally mean, namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith. Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402. In that view of the case, the standard set by the legislature is virtually reduced to one of "reasonableness." And it is held that "reasonableness" as "the standard of an act, which can be determined objectively from circumstances, is a common, widely-used, and constitutionally valid standard in law." People v. Curtiss, 116 Cal.App.Supp. 771, 300 P. 801, 805, and cases cited.'" And see State v. Langley, supra, and Associated Merchants of Montana v. Ormesher, supra.

It is apparent we believe that to permit cost to be ascertained only on a "good faith" and "reasonableness" basis would leave each processor and dealer to determine his own method of determining cost and the validity of each method could only be tested and finally determined by litigation.

We must and do hold that Sec. 416.415 is valid and enforceable as against respondent's contentions; and that any alleged vagueness, indefiniteness or difficulty in application may be remedied by reasonable rules and regulations which the Commissioner has authority to adopt.

Respondent's third assignment is that the Act is invalid because it permits findings of violations and impositions of penalties without requiring proof of wrongful intent. Respondent argues: "The substantive prohibitions in the Act apply irrespective of wrongful intent. That is, sales below 'cost' (Secs. 2, 4 and 5), area price discriminations (Sec. 3), combination sales (Sec. 6) and miscellaneous trade practices, such as granting discounts and making loans to retailers (Sec. 7) are declared illegal, and a violator is subjected to treble damage suits and ouster from the State (Secs. 10 and 17) even though there was no intent to injure, or divert trade from, a competitor or to harm competition. This results from the statutory language, repeated in all substantive prohibitions (Secs. 2–7), which imposes the prohibitions when there is 'the intent or * * * the effect' of causing such injury to, or diversion of, trade or harm to competition."

The particular provisions last referred to prohibit sales below cost "with the intent or *with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly * * *.*" (Italics ours.)

Subsection 2 of Sec. 2 of the Act (§ 416.415[2] ) as stated provides: "Proof of the advertising, offer to sell or sale of milk products by a processor or distributor for less than cost to the processor or distributor is *prima facie* evidence of a violation of this section."

Subsection 6 of Sec. 8 (now § 416.445 [6] ) states:

"The provisions of sections 416.415 to 416.430 do not apply to advertisements, offers to sell or sales where: * * * The price of the item is made in good faith to meet the equally lower price of competition, provided however, the person charged with a violation of this section further affirmatively proves the reduction in price is not made with the intent or with the effect of unfairly diverting trade from a competitor, or of otherwise injuring a competitor, or of destroying competition, or of creating a monopoly, and unless such is affirmatively shown, the court shall enter its order enjoining the violation as charged."

Respondent concedes that these provisions of the Act are supported by McElhone v. Geror, supra; and May's Drug Stores v. State Tax Commission, supra. Respondent relies upon the case of Englebrecht v. Day, 201 Okl. 585, 208 P.2d 538; Perkins v. King Soopers, Inc., 122 Colo. 263, 221 P. 2d 343, 345; State v. Ross, 259 Wis. 379, 48 N.W.2d 460, 464, 465; Mott's Super Markets, Inc. v. Frassinelli, 148 Conn. 481, 172 A.2d 381, 384, and Fairmont Creamery Co. v. State of Minnesota, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893. Respondent says the Englebrecht and Fleming cases, supra, considered the McElhone and May's Drug Stores cases and rejected their holding. Respondent insists that the Englebrecht case should be followed and the judgment of the trial court affirmed.

The Englebrecht case construed the Oklahoma statute, a criminal statute, in which there could be fines assessed not to exceed $500. The Connecticut statute ruled in the Mott case provided for fines for violation and the Colorado statute ruled in the Perkins case makes violation of the Act a misdemeanor. The Perkins case recognized the right of the Legislature to declare the proof of one fact shall be presumptive or *prima facie* evidence of another, as being no longer open to serious dispute in that jurisdiction or elsewhere. It is well settled that statutes creating criminal offense must be construed strictly against the state. The Wisconsin statute dealt with in the Ross

case provides for fines and imprisonment. However, in State v. Ross, supra, the court held that, in the absence of a showing to the contrary, it could be concluded that a merchant selling goods below cost fixed by the statute does so with the intent of violating the Act. The Court said (1. c. 48 N.W.2d 460, 464 [5] ): "The plaintiff established herein that the defendant had advertised or sold items of merchandise below cost, and the defendant did not offer any evidence in his behalf to show that he did not intend to violate the statute. In the absence of a showing to the contrary, it can be concluded that a merchant selling certain goods below cost fixed by statute does so with the intent of violating the statute."

In the exercise of its police power the State has the power to prohibit acts of a nature set forth in Secs. 2 to 7 of the Act (Secs. 416.415–416.440) without specifically providing that the actor be motivated by an express intent to injure or any criminal or willful intent. This is particularly true since the Act contains no provisions for criminal penalties and so eliminates the necessity for requiring criminal or willful intent as an element of a violation. May's Drug Stores, Inc. v. State Tax Commission, supra, 45 N.W.2d 245, 251 et seq.; McElhone v. Geror, supra; Schwegmann Bros. Giant Super Markets v. McCrory, supra, 112 So.2d 606, 617 [6]; Rust v. Griggs, 172 Tenn. 565, 113 S.W.2d 733; Milk Control Commission v. Rieck Dairy Division, etc., 193 Pa.Super. 32, 163 A.2d 891, 893. There is no valid ground for a strict construction of the Act against the State in this proceeding and we think it must be given a liberal construction in order that its beneficial purposes may be subserved.

Respondent further contends that the Act is invalid because its prohibitions are based on the uncertain term "unfairly diverting trade." (Sections 2–7 of the Act.) The trial court found the term to be vague and indefinite. Respondent insists that "the statute at bar is unconstitutionally vague in prohibiting competitive practices which 'unfairly' divert trade from a competitor." Re-

# 754

spondent says that the term "unfairly diverting trade" from a competitor is patently ambiguous. Respondent also says the issue strikes at the heart of all of the substantive prohibitions of the Act and would authorize an affirmance of the judgment below. In determining the meaning of the Act respondent would remove the mentioned term from the context in which it is used in the several sections with reference to sales below cost.

Respondent cites General Motors Corporation v. Blevins, D.C., 144 F.Supp. 381, 395, where the court held that a Colorado statute making it unlawful and *a criminal offense* for an automobile manufacturer or distributor to cancel or fail to renew a motor vehicle dealer's agreement "unfairly, without due regard to the equities of said dealer and without just provocation" violates the due process provision of the Fourteenth Amendment to the Federal Constitution for failure to provide an ascertainable standard of guilt. The court also said that the terms of a penal statute creating a new offense must be sufficiently explicit to inform those, who are subject to it, what conduct on their part will render them liable to its penalties.

The case has no application here in view of the wording of our statute. A case more in point is Federal Trade Commission v. Gratz, 253 U.S. 421, 40 S.Ct. 572, 575, 64 L. Ed. 993, where the Court said: "The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly."

■ Whether an act is committed with the intent or with the effect of "unfairly diverting trade from a competitor", the court

is of course competent to decide and to give a reasonable definition and construction of the words used when a proper case is presented. Whether or not a sale below cost has unfairly diverted trade is a matter of proof in each instance and must depend on the facts and circumstances shown. The provision is subject to a reasonable interpretation. See Mahon v. Scearce, Mo.App., 228 S.W.2d 384, 388 (fairly to measure); Chapman v. State Social Security Commission, 235 Mo.App. 698, 147 S.W.2d 157, 159 (fair hearing); Mary Muffet, Inc. v. Smelansky, Mo.App., 158 S.W.2d 168, 170 [7, 8] (unfair competition); and Miller v. Kansas City Power & Light Co., Mo.App., 332 S.W. 2d 18 (unfair labor practice).

■ The Act is not so vague, indefinite and uncertain in the respects mentioned as to deny due process, but is a valid exercise of police power.

Respondent next contends that the Act is "invalid because it creates arbitrary presumptions of violations, from proof of facts which are not reasonably probative of wrongful intent or harmful results." This assignment is directed to the second paragraph of the second section of the Act (now § 416.415[2]). Respondent insists that "the presumption of misconduct (as defined in the Act) from proof indicating sales below 'cost' is wholly arbitrary and unjust, and violates the basic concepts of fairness which have been attached to the words 'due process.'" Respondent cites Great Atlantic & Pacific Tea Co. v. Ervin, D.C.Minn., 23 F.Supp. 70; Wiley v. Sampson-Ripley Co., 151 Me. 400, 120 A.2d 289; Mott's Super Markets, Inc. v. Frassinelli, 148 Conn. 481, 172 A.2d 381, 385–386. Respondent "does not deny that statutes may create presumptions, when they reasonably follow from proof of other facts, nor does plaintiff deny that there may be occasions when a price-cutter acts with a predatory purpose," but respondent says that, "such a motive is neither universal nor even usual * * * and therefore a legislative attempt to ar-

bitrarily boost a mere possibility into a probability is invalid."

The cases relied on by respondent deal with *criminal statutes* where proof of *intent* is required. The Missouri statute contains no criminal penalties and is not a criminal statute, and is not required to be strictly construed against the State. The Tea Company case, supra, has no application here as clearly appears from respondent's statement with reference to it as follows: "The statute provided that proof of a grocer's sales at less than the manufacturer's list price, less published discounts, plus a statutory mark-up for the cost of doing business, were 'not only *prima facie* evidence that the sale was a sale below cost, but *also* that the vendor, in making the sale, *intended* to injure competitors and destroy competition.'"

 The applicable rule is well stated in City of St. Louis v. Cook, 359 Mo. 270, 221 S.W.2d 468, 470, as follows:

"Giving a regard to due process, the power to provide such an evidentiary rule is qualified in that the fact upon which the presumption or inference is to rest must have some relation to or natural connection with the fact to be inferred, and that the inference of the existence of the fact to be inferred from the existence of the fact proved must not be purely arbitrary or wholly unreasonable, unnatural, or extraordinary. * * * And it is clearly beyond the legislative power to prescribe what shall be conclusive evidence of any fact. O'Donnell v. Wells, 323 Mo. 1170, 21 S.W.2d 762 * * *. It is 'only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed (or inferred), and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.'" And see Mobile, J. & K. C. R. Co. v. Turnipseed, 219 U.S. 35, 31 S.Ct. 136, 137, 55 L.Ed. 78. Also see McFarland v. American Refining Sugar Co., 241 U.S. 79, 86, 87, 36 S.Ct. 498, 60 L.Ed. 899, and

Morrison v. People of State of California, 291 U.S. 82, 88, 89, 54 S.Ct. 281, 284, 78 L.Ed. 664. In the Morrison case the Court said: "The decisions are manifold that within the limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression." And see Schwegmann Bros. Giant Super Markets v. McCrory, supra, 112 So.2d 606, 617[6].

Respondent next contends that, "the provision for a statutory mark-up for non-processing retailers of milk is an invalid and arbitrary interference with freedom of contract." Respondent refers to Section 4 of the Act (now § 416.425) and to paragraph 6 of Section 1 of the Act (now § 416.410[6]) where "cost to retailer" is defined as "the invoice price paid by the retailer plus the retailer's cost of doing business. In the absence of specific evidence the cost of doing business shall be presumed to be eight per cent of the invoice price, and this cost shall be calculated to the nearest half cent per sales unit."

 Freedom of contract is of course subject to a valid exercise of the police power of the state (Turner v. Kansas City, supra), but an act which purports to be an exercise of the police power must not be unreasonable, arbitrary, unduly oppressive or patently beyond the necessities of the case and the means employed must have a real and substantial relation to the object sought to be obtained. On the record presented we find a valid exercise of the police power. Further, respondent is *not* a non-processing

retailer, but does insist that it has a right to object to Sec. 4 of the Act on the ground that the Act is intended to operate as a whole. State v. Bengsch, 170 Mo. 81, 70 S.W. 710, 719. We need not rule that issue, because in ruling objections to Sec. 2 of the Act (§ 416.415) we have, in effect, ruled respondent's objection to Sec. 4. And see State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75, 78. (Only such persons as are in some way prejudiced by an unconstitutional law can complain of it.)

Respondent further refers to paragraph 6 of Sec. 1 of the Act as "the statutory presumption that a grocer's cost of doing business is eight per cent of the invoice price to the grocer." The rule applies in the absence of specific evidence of cost. Respondent says this is an arbitrary and unreasonable attempt at price-fixing, "because the required allocation of a grocer's costs to a particular product presents a difficult task to the cost accountant, the provision necessarily results in the adoption by grocers of uniform 8% markups, whether or not their operations require such receipts, in order to be assured that they are not selling in violation of the law." Respondent further says that, "consumers in Missouri will suffer from the arbitrary choice by the legislature of 8% of invoice price as the presumptive cost of doing retail business." However, the propriety, wisdom, and expediency of legislation enacted in pursuance of police power is exclusively a matter for the Legislature, and the exercise of police power can only be declared improper or invalid when rules and regulations imposed thereunder can be said to be unreasonable. Passler v. Johnson, Mo.Sup., 304 S.W.2d 903[4]; May's Drug Stores v. State Tax Commission, supra, 45 N.W.2d 245, 249[3].

Respondent further refers to subsection 2 of Sec. 4 (§ 416.425[2]) as "the defective evidentiary rule for non-processing retailers (grocers)." We leave to a proper case a determination of whether that subsection is fatally defective by reason of its failure to directly describe such sales, as sales "for less than costs to the retailer."

As stated, it is apparent that respondent's objections to Sec. 4 of the Act (now § 416.425) are similar to its objection to Sec. 2 of the Act. Respondent relies particularly upon Harris v. Duncan, supra, and Gwynette v. Myers, supra, which represent a minority view in holding that the milk industry is not "affected with a public interest" and that the police power of the State to promote the order, safety, health, morals and general welfare may not be exercised to control and regulate the sale of milk and milk products by an unfair milk sales practices act, and that such acts violate the due process of law provisions of the State Constitutions. We refuse to follow these cases.

■ Respondent next complains of Sec. 3 of the Act (§ 416.420) and insists that: "The statutory prohibition against area price discrimination is vague and indefinite, and therefore invalid." Many of the objections to this section have been disposed of in preceding portions of this opinion and need not be repeated here. Respondent further insists that "price discrimination" has no fixed meaning, and that ambiguity arises from the reference to "actual transportation costs," and from the fact that cities and towns are located in counties so that it does not appear what price will control. We do not find the term "actual transportation cost," or the words "discriminate in price" to be so vague and indefinite as to deny due process. If in the application of the law material difficulties or uncertainties appear they may be corrected by rules and regulations promulgated by the Commissioner, or a proper case may be presented to the court for decision. Difficulty of application does not make a statute unconstitutional. McElhone v. Geror, supra. Many of the arguments made should properly be

directed to the Legislature as appears from respondent's next contention, that the statutory prohibition of "combination" prices in Sec. 6 of the Act (now § 416.435) "is an arbitrary interference with an innocent and desirable practice." Respondent also objects to this section on the same grounds that have been ruled in disposing of complaints as to other sections. We find no merit in these new and additional objections to Secs. 3 and 6 of the Act.

■ Respondent next complains of Sec. 7 of the Act (now § 416.440) and insists that the Act "is invalid for prohibiting volume discounts and assistance to grocers, thereby taking without due process of law the liberty and property of plaintiff, including the right to make lawful contracts and to make use of its property without arbitrary regulation." Respondent says that this section of the Act "contains all of the standard defects pointed out in" prior sections of the brief against other sections of the Act, and further insists that "the practices treated as *'prima facie'* violations of the act are in fact innocent, wholesome and desirable." It is apparent that this latter argument should be presented to the Legislature rather than to the Court. Further, the rights claimed are subject to a valid exercise of the police power of the State. Respondent quotes at length from Fairmont Food Company v. Burgum, N.D., 81 N.W.2d 639, 646–647, in part as follows: "The trade practices (described above) are not in themselves objectionable. They are legitimate business transactions between wholesalers and retailers. There are no relevant facts in the record showing that these practices have had a tendency to restrict competition or to create monopolies. Neither is there any evidence in the record that the practices prohibited bear any reasonable relation to any vice or evil affecting the public health, morals, or general welfare * * *." Respondent says this is more persuasive than the case of Borden Company v. McDowell, 8 Wis.2d 246, 99 N.W.2d 146, 156, "which

sustained the validity of a statute somewhat similar to that enacted in North Dakota." Respondent also relies on Gwynette v. Myers, supra, which rules for "free enterprise in the milk industry." Respondent further says that this Sec. 7 of the Act would destroy *a system of desirable practices* in order to prevent possible future abuses. Again, the issue was for the Legislature and not for the courts. The provision is within the police power of the State. We do not find it arbitrary and unreasonable.

■ Respondent further contends that the Act "violates due process in prohibiting absolutely the right of economic self-defense against competitors who grant discounts, use combination pricing or assist grocers, and limiting in ambiguous terms the right of such self-defense against price cutters and sellers engaging in area price discrimination." Respondent insists that the denial of the right of economic self-defense has never been sustained by the courts and constitutes a clear denial of due process clauses of the State and Federal Constitutions. Respondent further insists that the exemption section of the Act, Sec. 8 (now § 416.445), is entirely inadequate and that the denial of the right of economic self-defense would "undoubtedly violate the due process clauses of the State and Federal Constitution." Respondent says that an area price differential might not be allowed, as a defensive act, when the defensive act by the merchant might have the effect of unfairly diverting trade from a competitor; and that, if respondent seeks to meet competition, it might be faced with a threat of proceedings by the Commissioner claiming that the exemption section does not apply to these competitive practices. We think that Sec. 8 is within the police power of the State. The sufficiency of the exemptions were for the Legislature. The right of economic self-defense is not denied to respondent under the provisions of Sec. 8 of the Act, but to the extent stated is authorized.

Respondent next contends that the Act "unlawfully delegates to the Commissioner of Agriculture the right to prescribe accounting rules which would prohibit volume pricing and otherwise reorganize marketing practices in the milk industry." Respondent further says that most of the purely procedural provisions of the Act, beginning with Sec. 9, are not directly involved in this litigation, but that Sec. 11 of the Act (§ 416.460) which provides that, "the commissioner is authorized and directed to promulgate rules and regulations to carry out the purposes" of the Act is not subject to criticism, if this authorization merely deals with administrative details, but that it is apparent that any attempt to make this Act workable as a comprehensive marketing code for the milk industry will necessarily require the issuance of rules by the Commissioner which are broadly legislative in nature, and that such rules and regulations are prohibited by Sec. 1, Art. II of the 1945 Constitution forbidding the delegation of legislative power to executive officers. Respondent further says that insofar as this legislation authorizes and indeed requires the Commissioner to issue such "rules" in order to give meaning to the statute, the statute itself is defective as an abdication of legislative powers to the Commissioner. Respondent says that the defendant Commissioner is engaged in the legislative processes when he effectively prohibits volume pricing by requiring that all wholesale delivery costs be averaged, when he exempts sales to schools and when he delays the application of the law to outstanding loans.

It is apparent that respondent's complaint is not of the authority granted by Sec. 11 of the Act, but as to whether or not the Commissioner may make rules and regulations which constitute legislation prohibited by constitutional provision. We may not determine the validity of any rules and regulations in this proceeding or determine the validity of any rules and regulations which the Commissioner may have made in an attempt to comply with the provisions of Sec. 11 of the Act (now § 416.-460). The Act became effective on August 29, 1959, and this action was filed September 11, 1959. We may not assume that the Commissioner will exceed the authority granted to him or that he will invade the legislative field. 11 Am.Jur. p. 955, Constitutional Law, Sec. 240; State ex rel. Priest v. Gunn, Mo.Sup., 326 S.W.2d 314, 320; State on Inf. Killam v. Colbert, 273 Mo. 198, 201 S.W. 52, 55[6–9]; Jersey Maid Milk Products Co. v. Brock, supra, 91 P.2d 577, 597 [29, 30]; 42 Am.Jur., p. 353, Public Administrative Law, Sec. 49.

Respondent's twelfth and final assignment of objections to the Act is that the Act, "unlawfully burdens interstate commerce and invades the antitrust field, for interstate commerce, which has been preempted by Federal legislation." This assignment is directed to Sec. 19 of the Act (§ 416.500). Reference is had to that section which provides: "Any person who operates a milk or milk products manufacturing or processing plant located outside of this state and sells, offers for sale or distributes milk or milk products in this state shall pay the license fee provided for in sections 416.410 to 416.560 on all sales in this state of milk products except cottage cheese, and shall be subject to all of the provisions of sections 416.410 to 416.560." Respondent sells, in Mercer County, Missouri, fluid milk and milk products, manufactured in its Des Moines, Iowa, plant, thus crossing the line between Missouri and Iowa. Also some of respondent's major competitors in the Kansas City, Missouri, area sell in Missouri from processing plants located in Kansas. Respondent concedes that "unless the Act controls sales by nonresidents, they might easily become dominant in the market in the Missouri counties accessible to the state line, by engaging in competitive practices which are forbidden to local dairies." However, respondent insists that the attempt to control the interstate milk market is clearly invalid under the Commerce Clause, Art. I, Sec. 8, Clause 3 of the Constitution of the United States.

Respondent says that, "in enacting such legislation as the Sherman Act, the Clayton Act, the Federal Trade Commission Act, and the Robinson-Patman Act (15 U.S.C., Sections 1 et seq., 13 et seq., 41 et seq., and 13(a) et seq.), Congress occupied *this* (anti-trust) field and closed it to state regulation." Respondent cites Garner v. Teamsters, Chauffeurs and Helpers Local Union, etc., 346 U.S. 485, 501, 74 S.Ct. 161, 98 L. Ed. 228. Respondent further argues that, "volume pricing is permitted under Federal law, as an exception to the Robinson-Patman prohibition against price discriminations, 15 U.S.C., Section 13(a)"; that "the same act permits nondiscriminatory furnishing of free services and facilities to customers, 15 U.S.C., Section 13(e)"; that "discounts, rebates, allowances and advertising service charges may be granted on a nondiscriminatory basis, 15 U.S.C., Section 13(a)"; that "Federal laws prohibit predatory pricing, but do not forbid sales below cost"; and that "price reductions to meet competition are permitted under Federal law, even though an injury to competition may result from such a price reduction, Standard Oil Company v. F. T. C., 340 U.S. 231, 71 S.Ct. 240 [95 L.Ed. 239]." Respondent also says that "the aim of this legislation is to create 'soft' competition, as contrasted with the philosophy of the Sherman Act and most of its successors which seek to bring to consumers the full benefits of a competitive economy, even though this may make it more difficult for the small businessman to survive."

Does the Act in question burden interstate commerce and invade a field preempted by Federal law? We think it does not. The purpose of the Act is not to regulate interstate commerce. The purpose is to prohibit unfair milk sales practices in Missouri. It attempts to regulate sales and offers to sell of milk products within the State of Missouri and to regulate the activities specifically related to the sale of milk and milk products within this State. In the case of Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752, the Court held that a Pennsylvania state statute regulating the milk industry, which required dealers to obtain licenses, file bonds conditioned on payment of purchases from producers and to pay producers at least the minimum prices prescribed by an administrative agency was *not in violation of the Commerce Clause of the Federal Constitution* as applied to a dealer who, at a receiver station maintained by him within the state, purchased milk from a neighboring farm, all of which he shipped to another state for sale. The Court said: "One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or indirectly involves or burdens interstate commerce. This is so even though, should Congress determine to exercise its paramount power, the state law might thereby be restricted in operation or rendered unenforceable. * * * The purpose of the statute under review obviously is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania. Its provisions with respect to license, bond, and regulation of prices to be paid to producers are appropriate means to the ends in view." And see Schwegmann Bros. Giant Super Markets v. McCrory, supra, 112 So.2d 606, 618 [7-8].

In conclusion, we may say it appears that the object of the Missouri Unfair Milk Sales Practices Act is to prevent the sale of milk and milk products below cost with the intent or with the effect of unfairly diverting trade from a competitor or otherwise injuring a competitor, or of destroying competition, or of creating a monopoly. This object as we have held is within the police power of the State. The several provisions of the Act, which we have consid-

ered, are not arbitrary, unreasonable or capricious, neither are they so vague, general and indefinite as to be impossible of a reasonable, fair, and practicable administration. They clearly bear a real substantial and reasonable relationship to public welfare and are reasonably designed to accomplish the purposes of the Act. In our opinion they accord due process and are not unconstitutional in the respects claimed by respondent.

We now return to appellants' assignments of error and to appellants' contention that the trial court "erred in ordering the Commissioner of Agriculture, and his successors in office to refund the plaintiff forthwith the sum of $2,284.15," which sum had been paid to the Commissioner under Section 17 of the Act (now § 416.490). Appellants rely on Section 18 of the Act (now § 416.495) which provides: "1. All moneys collected and received by the commissioner, arising from any license fees established pursuant to sections 416.410 to 416.560, shall be paid into the state treasury and shall, by the state treasurer, be placed in a separate fund to be known as the 'Milk Control Fund' which is hereby established. 2. No money shall be paid out of this fund except by appropriations of the general assembly for the administration of sections 416.410 to 416.560." The license fees were paid and deposited as required by the Act.

Respondent insists that Secs. 17 and 18 of the Act fell with the rest of the Act and that respondent was entitled to recover back the tax unlawfully collected, citing State ex rel. S. S. Kresge Co. v. Howard, 357 Mo. 302, 208 S.W.2d 247 and Kleban v. Morris, 363 Mo. 7, 247 S.W.2d 832, 840. Respondent further insists that the payment was made under duress and under protest; and that the common law provides a remedy. Appellants, on the other hand, stand upon the statute under which the money was collected and paid into the State treasury.

Since no provision of the Act has been held invalid, it follows that the judgment entered against the appellants for the license fees paid to defendants' predecessors. in this case must be reversed.

The judgment is set aside in its entirety and the cause is remanded with direction to the trial court to enter a new declaratory judgment in conformity to the views expressed in this opinion.

HYDE, C. J., and WESTHUES and HOLLINGSWORTH, JJ., concur.

EAGER, J., dissents in separate opinion filed.

STORCKMAN and LEEDY, JJ., dissent and concur in dissenting opinion of EAGER, J.

EAGER, Presiding Judge.

While unanimity is desirable in matters of this kind, I am impelled to dissent, after a review of the briefs, the act and the authorities. I do this on the basic ground that this act constitutes special legislation, forbidden by Art. 3, § 40(30) Mo. Constitution, 1945, which provides that: "The general assembly shall not pass any local or special law: * * * (30) where a general law can be made applicable, and whether a general law could have been made applicable is a judicial question to be judicially determined without regard to any legislative assertion on that subject." As pointed out in McKaig v. Kansas City, Banc, 363 Mo. 1033, 256 S.W.2d 815, 817–818, few states have constitutional provisions making that determination a judicial question, and consequently authorities from other states are of little value. The court there also said, loc. cit. 817–818: " ' " 'The test of a. special law is the appropriateness of its provisions to the objects that it excludes. It is. not, therefore, what a law includes, that makes it special, but what it excludes.' ' * * *" ' * * * The ordinance before us excludes all persons engaged in the business of selling all commodities and all mer- .

chandise except automobiles. In other words, it excludes all persons engaged in the business of selling television sets, radios, phonographs, refrigerators, washing machines, electric and gas ranges and heaters, trailers, golf equipment, furniture, hardware, clothing and many other articles. There is no reasonable basis for singling out those people who are engaged in the business of selling automobiles and excluding those people who sell the above enumerated articles of merchandise * * *."

Defendants and intervenors treat this point rather lightly (as, to a certain extent, the opinion also does) with assertions that the milk industry constitutes a recognized class, and that it has long been regulated. For many purposes it has, and it will continue to be. But the present act has absolutely nothing to do with questions of sanitation, quality, storage, inspection, or health, and actually nothing to do with distribution or supply, as such. It is, by counsel's very argument directed solely at "trade practices tending to create monopolies and destroying competition * * *" (Intervenors' brief, p. 28). It is directed solely at the *economy* of the milk industry.

In line with this avowed purpose, the act now appears as an addition to our Ch. 416 RSMo 1959, V.A.M.S., which has long dealt in broad terms with Monopolies, Discriminations and Conspiracies. The basic law was first enacted in 1891, and many amendments have followed, substantially all general in nature. The act now considered, though pursuing the same general aims, singles out the milk business from all others for its rigorous controls, and for a price regulation (if not a "fixing") based on "cost." Certainly the milk industry constitutes a legislative class for certain purposes; however, milk is perhaps no more essential to human health and welfare than meat, bread, grain, vegetables, fruit, medicines or clothing. Gwynette et al. v. Myers, 237 S.C. 17, 115 S.E.2d 673; Harris v. Duncan, 208 Ga. 561, 67 S.E.2d 692. There is nothing peculiar in the nature of milk which requires an economic classifica-

tion, and we take judicial notice of the fact that there are recurrent or continuing "price wars" in other commodities besides milk. A classification for legislative purposes must bear a reasonable and substantial relationship to the object to be achieved, and it must not be arbitrary or unreasonable. State on inf. of Taylor v. Currency Services, Inc., Banc, 358 Mo. 983, 218 S.W.2d 600. Defendants and intervenors refer frequently in the briefs to the federal anti-trust statutes proscribing monopolies and restraints of trade, and to the federal cases thereunder, as furnishing examples of an analogous situation. There is no real analogy on this point; those statutes apply to *all "commerce."* The analogy suggested may answer other questions raised by plaintiff, but not this one. Certainly none of the federal cases have construed the question of special legislation, and no cases from other states have construed our particular constitutional provision.

The genesis of defendants' and intervenors' arguments seems to lie in the case of Nebbia v. People of State of New York (1934), 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. That was a 5–4 decision upholding emergency and temporary milk legislation enacted during the depression of the thirties. Those sought to be protected were farmer-milk producers, not competing dairies. In essence, the case merely held that the industry was "affected with a public interest" and might be so regulated. No question of class legislation was presented or involved. There are subsequent federal cases which uphold somewhat similar legislation not enacted as temporary measures, but upon consideration of due process and equal protection under the federal constitution,—and not on the point with which we are concerned here. In the briefs and in the majority opinion cases are cited as supposedly controlling this particular problem of special legislation. None of these, as we read them, is really in point. We merely note the following as the principal cases cited: In May's Drug Stores, Inc. v. State Tax Commission, 242 Iowa

319, 45 N.W.2d 245, a *cigarette* pricing law was involved and upheld. The contention that the act was a special law does not seem to have been presented. The case illustrates how far legislative action may go, if commodities, articles or industries are to be thus singled out; indeed the opinion indicates (loc. cit. 249) that Iowa had previously, and on two separate occasions, adopted similar legislation regulating petroleum products and farm produce. In McElhone v. Geror, 207 Minn. 580, 292 N. W. 414, the act considered was a general act forbidding the sale below cost of commodities in general use. Clearly that was not class legislation; the question considered was due process, and the essence of the holding was that the state might protect against restraints of trade and monopolies (the very thing already forbidden by our §§ 416.010 to 416.400). In Poole & Creber Market Co. v. Breshears, 343 Mo. 1133, 125 S.W.2d 23, the statute prohibited the sale of any milk or milk derivatives to which any non-milk oil or fats had been added, a measure directed at both health and possible fraud upon the public. In Borden Co. v. McDowell, 8 Wis.2d 246, 99 N.W.2d 146, a statute regulating certain unfair trade practices in the dairy industry was upheld, but the act was apparently not attacked as a special law nor were any constitutional provisions mentioned relating to such a question. In State of Kansas ex rel. Anderson v. Fleming Co., Inc., 184 Kan. 674, 339 P.2d 12, portions of the Kansas act, in many respects similar to ours, were held unconstitutional; the case is certainly of no aid to defendants or intervenors here. It is apparently cited merely because the opinion states that the dairy industry had been regulated more completely than any other industry. The facts in H. P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865, are irrelevant here, and the opinion merely noted that the right of the states to regulate the production and distribution of milk, as intimately related to public health and welfare, had long been recognized. In ABC Liquidators, Inc. v. Kansas City, Missouri, Mo., 322 S.W.2d 876, an ordinance forbidding public auctions on Sunday was upheld as against the attack that it constituted class legislation. The court said, in part, loc. cit. 885: " 'The courts must determine the question, as other purely judicial questions are determined, by reference to the nature of the subject; not upon proof of facts or conditions, but upon the theory that judicial notice supplies the proof of what courts are bound to know, and that courts must be aware of those things which are within the common knowledge, observation and experience of men generally.' " The facts make the case inapplicable here. In effect, the ordinance was considered as an amplification of the general Sunday closing laws (loc. cit. 880), and of the long recognized power to regulate auctions (loc. cit. 882–883.) Note also that the ordinance was applicable to all commercial auctions. Certain other citations are wholly irrelevant. It may fairly be said that not a case cited upheld a law even basically similar to the present act as against the contention that it constituted a special law. It is doubtful if any out-state case could conceivably answer our Missouri problem.

Our general "anti-trust" laws have long been deemed sufficient to permit adequate enforcement of our public policy against unfair restraints of trade and monopolies in any branch of commerce or industry. State ex inf. Hadley v. Standard Oil Co., 218 Mo. 1, 116 S.W. 902, aff. 224 U.S. 270, 32 S.Ct. 406, 56 L.Ed. 760, Ann.Cas.1913D, 936. In that case some of the illegal acts consisted of "cutting prices" and giving rebates (loc. cit. 1025) and otherwise controlling prices in the accomplishment and maintenance of a monopoly. This general law, as we all know, forbids any agreement, combination or understanding in restraint of trade or competition (§ 416.010) in the purchase or sale of *any* product or commodity; it forbids any such agreement or understanding to "regulate, control or fix" the price of any commodity or thing; it forbids discriminations between different localities or communities in purchases or

sales, and it enacts drastic procedures and remedies. In many respects the present act is a *particularized duplication* of our long-established general law.

I see no reason why all of the asserted purposes of the present act might not have been accomplished by a rigid enforcement of the existing law, either as it stands, or with general amendments. If specific "cost" factors were deemed necessary in the legislative discretion, they might easily have been added by a general amendment. Various states have enacted "Unfair Practices" Acts generally prohibiting sales below cost. Ann. 118 A.L.R. 506; 128 A.L.R. 1126. It would seem that if a processor in Missouri sells milk to a retailer at an absurdly low wholesale price, and the latter resells it at an absurdly low retail price, at least over a continued period,—there would ordinarily exist some sort of agreement or understanding "in restraint of trade or competition" under existing law. We are not here, however, to decide a hypothetical case.

In passing we note that the Report of the Special Joint Legislative Committee states that it sought to avoid complete price control, "reluctant to adopt a remedy which is potentially as deadly as the malady * * *" and that "In the neighboring state of Tennessee the committee found what appeared to be the object of its quest. * * * The milk control legislation of other states was considered and investigated, but the Tennessee act was chosen as a model upon which to base a proposed solution for the problems of our own state." In a search of the Tennessee Annotated Statutes (Official Ed.) I find a general chapter prohibiting agreements, etc. to lessen free competition (Title 69, Ch. 1), a "Fair Trade Law," essentially granting the right to fix the resale prices in brand-name products (Ch. 2), a *general* "Unfair Sales Law," (Ch. 3), applying to the sale of all merchandise at "less than cost," by retailers or wholesalers, an "Unfair Cigarette Sales Law" (Ch. 4), a new Chapter (Ch. 6), concerning "Unlawful Trade Practices" in the sale of "Household Goods," and the "Milk and Milk Products" law appearing as Ch. 3 of Title 52 entitled "Food, Drugs and Cosmetics." That chapter was first enacted as a health and sanitation measure in 1939, and thereafter amended to and including 1961 to its present regulatory form. This conglomeration of special and general legislation only illustrates again the confusion and relative unfairness of special legislation. The Tennessee constitutional provisions providing for "General Laws" (Art. 11, § 8) are much less restrictive than ours.

In my opinion our entire act (now §§ 416.410–416.560) is invalid as special legislation in contravention of Article III, § 40 (30) Mo.Constitution, 1945. I think that many of plaintiff's attacks on the act are highly technical and of no real materiality. I do have much doubt of the validity of the requirement as to sales "for less than cost," as applied to any one individual item sold jointly by a processor of many items. The tenuous nature of this requirement is shown by the recitals of evidence in the majority opinion; it is also shown by the explanations attempted both by counsel and in the majority opinion to the effect that the term means only "average" cost or "approximate cost" or cost "reasonably construed." These expressions are perhaps as ambiguous as the original term, and none of the various explanations seems wholly satisfactory. I do not rest my dissent on that ground, however.

I would modify the judgment by specifying therein that the act as a whole is unconstitutional as in conflict with Article III, § 40 (30) of the Mo.Constitution, 1945, and as so modified, I would affirm the judgment.

On Motion for Rehearing

DALTON, Judge.

In view of the first and primary assignment in respondent's motion for rehearing to the effect that the Act in question is a local or special law where a general law could have been made applicable,

it seems apparent that the original opinion did not adequately discuss the question of whether House Bill No. 255 constituted a local or special law contrary to the provisions of subsection (30) of Section 40 of Article III of the Constitution of Missouri 1945, V.A.M.S., which prohibits the enactment of any local or special law *where a general law could have been made applicable*. The question is a judicial one to be judicially determined without regard to any legislative assertion on the subject.

"When a special law is passed \* \* \* the legislature necessarily determines, in the first instance, that a general law cannot be made to apply. But their determination is not final. There is, of course, a presumption that public officers have discharged their duties properly and every act of the legislature is presumed to be valid until there is a judicial determination to the contrary." Anderson v. Board of Com'rs of Cloud County, 77 Kan. 721, 734, 95 P. 583, 587; City of Springfield v. Smith, 322 Mo. 1129, 19 S.W.2d 1, 4; ABC Liquidators, Inc. v. Kansas City, Mo., Mo. Sup., 322 S.W.2d 876, 885(15).

In determining the constitutionality of a statute under the constitutional provision in question here we are not dealing with the matter of classification of the subject matter of the Act for the purpose of determining whether the Act violates other constitutional provisions such as equal protection of the law or due process, where the test is whether the legislative classification rests upon some difference which bears a reasonable and just relation to the Act in respect to which the classification is proposed. The question before us here is whether, *considering the purposes of the Act*, a general law could have been made applicable.

" 'A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. *The test of a special law is the appropriateness of its provisions to the objects that it excludes*. It is not, therefore, what a law includes, that makes it special, but what it excludes. If nothing be excluded that should be contained the law is general. Within this distinction between a special and a general law the question in every case is whether any appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects it is a general law. Hence, if the object of a law have characteristics so distinct as reasonably to form, *for the purpose legislated upon*, a class by itself, the law is general, notwithstanding it operates upon a single object only; for a law is not general because it operates upon every person in the state, but because every person that can be brought within its predicament becomes subject to its operation.' " (Italics ours.) State ex inf. Barrett ex rel. Bradshaw v. Hedrick, 294 Mo. 21, 241 S.W. 402, 407; Budd v. Hancock, 66 N.J.L. 133, 135, 48 A. 1023, 1024.

The principle is perhaps best illustrated in the case of City of Springfield v. Smith, supra, 19 S.W.2d 1, 5(8); and McKaig v. Kansas City, 363 Mo. 1033, 256 S.W.2d 815.

In the Smith case the city ordinance prohibited on Sunday "only the keeping 'open of any theatre, playhouse, or any other place where theatrical performances, vaudeville shows or moving picture exhibitions are given or conducted,' or conducting or taking part in any such performance, show or exhibition." This Court pointed out that omitted from the ordinance was any prohibition against "the keeping open and operation of such public amusement businesses as concerts, circuses, amusement parks, public halls, sparring exhibitions, wrestling exhibitions, and like public amusement businesses \* \* \*." The Court said: "Each and all of the public amusement businesses above enumerated, but omitted from

the operation of the ordinance, affect the permissible subject-matter of this legislation in very much the same way. The keeping open and operation of each requires similar labor activities, each furnishes to the public for a consideration an opportunity for excitement and entertainment, and each is sufficiently attractive to induce large portions of the public to attend, and each is fairly and reasonably comparable with theaters, vaudeville shows, and moving picture exhibitions in their possibilities of disturbing a day of rest. We find no reason which would justify the regulation of one in this regard which will also not apply with equal force to the others. They all appear to be similarly situated with reference to the permissible subject-matter sought to be dealt with by the ordinance."

The Court further said: "We are not here so much concerned with determining how many activities which threaten to disturb *the subject-matter sought to be protected* could or might be included in the one piece of legislation, but our problem of instant concern is *whether some have been omitted* from the ordinance now involved *which it would be clearly unreasonable and arbitrary to omit.*" (Italics ours.) City of Springfield v. Smith, supra, 19 S.W.2d 1, 4, 5.

In McKaig v. Kansas City, supra, this Court held that a city ordinance prohibiting automobile dealers from keeping their places of business open on Sundays and six national holidays was unconstitutional as a "special law" excluding from its operation all persons engaged in businesses of selling all other commodities and merchandise, except automobiles, and without any reasonable basis for such distinction.

After pointing out that "the laws of this state that prohibit work on Sunday * * * are based upon a sound public policy which recognizes that rest one day in seven is for the general good of mankind" the Court further said: "The ordinance before us excludes all persons engaged in the business of

selling all commodities and all merchandise except automobiles. In other words, it excludes all persons engaged in the business of selling television sets, radios, phonographs, refrigerators, washing machines, electric and gas ranges and heaters, trailers, golf equipment, furniture, hardware, clothing and many other articles. * * * There is no reasonable basis for singling out those people who are engaged in the business of selling automobiles and *excluding those people who sell the above enumerated articles of merchandise who are permitted to keep open their places of business on Sundays and the six named holidays.*" (Italics ours.) [256 S.W.2d 815, 817(7).]

Subsection (30), Section 40 of Article III is somewhat similar in certain respects to Section 28 of Article I of the Constitution of 1945 with reference to the taking of private property for public use. It is there stated that "when an attempt is made to take the private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." In the case of Bowman v. Kansas City, Mo.Sup., 233 S.W.2d 26, 34, involving the question of whether the taking of private property by the city for off-street parking was a public purpose, the judicial determination was made by this Court upon stipulated facts and upon facts of which the Court took judicial notice. In the case of City of Kirkwood v. Venable, 351 Mo. 460, 173 S.W.2d 8, 11, it was pointed out that the owner of property sought to be taken for a city park "had the right to demand that the court hear the evidence and determine whether or not the purpose of the proceeding was to condemn for a public use or for a private use."

 In the case under consideration here evidence could have been heard on the question whether a general law could have been made applicable, but the plaintiff offered no evidence tending to show that any other industry had been unreasonably and arbitrarily omitted from the Act. On the

other hand, the defendants did offer, and the Court received in evidence, the "Final Report of the Joint Committee on Milk Producers and Distributors" which was referred to and quoted from in the majority opinion. In determining the issue presented this Court is not limited to the evidence the parties see fit to offer, but may consider matters of common knowledge under the doctrine of judicial notice.

 Without question, we believe that House Bill No. 255, regulating the sale of milk and milk products in Missouri, is a special law based upon a sound classification, since the milk industry, as such, has long been the subject of special legislation. Further, considering *the subject-matter of the present Act and the evils sought to be corrected,* a general law could not have been made applicable, and no other similar industries have been omitted which it was *clearly unreasonable and arbitrary to omit.*

. In determining the issue presented we must first look to the provisions of the Act, which consists of thirty-one sections. It is a most comprehensive Act relating to the sale of milk and milk products. It was held to be void in its entirety by the trial court and its enforcement prohibited by injunction because certain provisions of the Act were held to be violative of certain constitutional provisions. It is true that some sections of the Act do more or less overlap the subject matter of certain general criminal statutes of the State, which statutes of course apply to the milk industry equally with all businesses, however, the Act in question is not a criminal statute. The dissenting opinion refers to the broad terms of Chapter 416 RSMo 1959, V.A.M.S. dealing with Monopolies, Discriminations and Conspiracies, which are *criminal statutes.* See Secs. 416.130, 416.150, 416.280 RSMo 1959, V.A.M.S.

The purpose of the Act clearly appears from the last twenty sections of the Act where a licensing system is set up for manufacturers and processors of dairy products and fees are fixed and provisions made for the revocation of licenses. The Act also authorizes the Commissioner to promulgate rules and regulations to carry out the purposes of the Act, to subpoena witnesses, carry on investigations and employ auditing firms in the examination of books and records. Provision is made for claimants to make complaints and for investigations to be carried on incident thereto. Section 20 of the Act provides for the issuance of "stop orders" and enjoining of certain operations without a license. Numerous detailed provisions are set out in the Act for making the Act effective, particularly the licensing regulations, the investigation of complaints and the use of the injunctive processes of the courts to compel compliance. The purpose of the Act also appears from the evidence contained in the Committee report that, "Procedures for the investigation of alleged violations are provided and complainants are required to post a bond from which the investigation costs are paid if the complaint proves to be spurious. The latter clause is included to discourage malicious false accusations while retaining the benefits of public assistance in the enforcement of the act. Violators are subject to injunction, the assessment of treble damages when others are injured and the revocation of their licenses to handle milk products. Also included in the bill are sections designed to make the law applicable to those selling milk in Missouri from without the state."

 In view of all of the thirty-one provisions of the Act can it be said that any other similar industry has been unreasonably and arbitrarily excluded? The "Final Report of the Joint Committee on Milk Producers and Distributors," offered in evidence by defendants, pointed out that "between 1933 and 1936 twenty-seven states adopted milk price control legislation." Under many of these acts provision was made for definitely fixing the price of milk. The principal opinion further points to the fact that under Federal statutes orders are designated to help stabilize supplies and prices of fluid milk; that under these orders the

Secretary of Agriculture sets the minimum prices which handlers are required to pay dairymen in certain areas. Under the thirty-six orders now in effect, the price to be paid to producers for fluid milk at each of the thirty-six locations is determined by the Department of Agriculture. These orders include the St. Louis area, the St. Joseph area and the greater Kansas City area. One need only be cognizant of facts commonly known and widely publicized to become familiar with the fact that the economy of the milk industry throughout the entire United States has become "so eccentric that economic controls have been found at once necessary and difficult." (H. P. Hood & Sons v. DuMond, 336 U.S. 525, 69 S.Ct. 657, 661, 93 L.Ed. 865.) It should be unnecessary to further refer to matters of common knowledge with reference to the production of milk, its distribution and use. While beef, pork, mutton and many other products may quite as well be produced in Argentina, Australia or New Zealand, the same situation does not exist with reference to fresh milk produced by local dairies throughout the State of Missouri and much of it used locally in the community where it is produced. It is further a matter of common knowledge that small dairy herds and small dairy operators are continually being forced out of business by the general movement toward centralization of the industry under the control of the great industrial concerns, which exert a controlling force over wide areas. It is also clear that when local dairies and local dairy herds are once eliminated from a particular community they are unlikely to be re-established in view of present industrial trends.

We fully agree with the statement in the dissenting opinion that the Act is "directed solely at the *economy* of the milk industry." The same is substantially true of the statutes of the many states *fixing the price of milk and milk products,* and of the Federal orders fixing the price to be paid to producers of fluid milk. Why has the milk industry been singled out for all of this special legislation if there is no difference between the milk industry and others as far as its economy is concerned?

As stated in the majority opinion, the "respondent concedes the right of the State to regulate and control the production and distribution of milk with regard to sanitation and purity but not as to sales and distribution and sales practices." However, regulations as to sanitation and purity may be quite as important to many types of other food stuffs as they are to milk, but we know of no such act having been declared unconstitutional because the act did not cover all other foods in need of sanitation and purity regulations.

While House Bill No. 255 does not undertake to specifically fix the sale price of milk to the consumer nor the price to be paid to the producer, still it is apparent from its provisions and the machinery and licensing system set up for the enforcement of its provisions and for the supervision of the industry that the essential purpose of the Act is the maintenance of local dairy herds and the local dairy industry throughout the State and the protection of such industry, because it is in a special economic class. From the evidence offered by the parties and from the facts of common knowledge it cannot be said that any other similar industry has *unreasonably or arbitrarily been omitted* from the provisions of the Act considering the subject matter of the Act and the evils sought to be corrected thereby. Subsection (30) of Section 40 of Article III, Constitution of Missouri 1945 as applied in the McKaig and City of Springfield cases, supra, has no application under the facts of this case.

It will be unnecessary to review other assignments in the motion for rehearing. They have been examined and found to be without merit. Respondent's motion for a rehearing is overruled.

WESTHUES, C. J., HOLLINGSWORTH and HYDE, JJ., concur; EAGER, STORCKMAN and LEEDY, JJ., dissent.